353 So.2d 144 (1977)
INTERNATIONAL HARVESTER COMPANY, Petitioner,
v.
John D. CALVIN, Director of the Division of Motor Vehicles of the Department of Highway Safety and Motor Vehicles of the State of Florida, and Rich Motors, Inc., Respondent.
No. DD-193.
District Court of Appeal of Florida, First District.
November 29, 1977.
Rehearing Denied January 10, 1978.
*145 John H. Schulte of Smathers & Thompson, Miami, for petitioner.
Edwin E. Strickland, Gen. Counsel, Enoch J. Whitney, Asst. Gen. Counsel, Tallahassee, and Edwin Marger, Atlanta, for respondents.
J. Robert McClure, Jr. of McClure, Wigginton, Campbell & Owen, Tallahassee, amicus curiae.
ERVIN, Judge.
International Harvester petitions for review from an order of the Director of the Division of Motor Vehicles setting aside an attempted cancellation of its franchise agreement with its West Palm Beach dealer, Rich Motors. The Director has so acted under Section 320.641, Florida Statutes (1975), which allows him to find an "unfair cancellation" in such situations.

THE FACTS
Rich Motors is a family owned business with facilities adjacent to the Rich Ice Cream Company plant. Williard Rich, Sr., president of both companies, and Williard Rich, Jr., general manager of Rich Motors, have their offices in the ice cream plant. Mr. Rich, Jr. testified he devoted about forty per cent of his time to the running of the truck business. There is no other full-time general manager. The sales manager is also a full-time commissioned salesman. The dealership facilities are basically unchanged since before Rich Motors came into existence in 1965.
A contract was executed on April 1, 1971, between the parties as part of a nationwide renegotiation of agreements between International Harvester and its dealers. The requirements of Rich Motors are cast in general terms. Rich Motors agreed, for example, to "provide and maintain physical facilities commensurate with the sales possibilities and service needs in the Dealer's trade area, including ... a building of acceptable appearance and sufficient size ..."; to provide and maintain signs recommended and approved by International Harvester; to maintain an inventory of International vehicles and parts "in *146 keeping with the sales possibilities in his trade area"; to use promotional and advertising materials made available by the company and to advertise as provided for in the agreement. Perhaps the most important portion of the contract was for Rich Motors "[t]o achieve a reasonable share of the market, for the goods covered by the agreement, in the normal trade area served by the Dealer's location."
In return, Rich Motors was made the franchise dealer for the eastern half of Palm Beach County for heavy duty trucks and the eastern half of Palm Beach County north of Boynton Beach for light and medium duty trucks. Rich's trade area was considered by International a primary market and one of the most important in the state.
By early 1972, Rich was receiving unsatisfactory performance evaluations from International's district manager. In April, 1974, International Harvester notified Rich it was in violation of several sections in the agreement and that the contract would be terminated if corrective action was not taken. In August, 1975, International Harvester notified Rich, effective 90 days later, the agreement between the parties would be terminated.
Rich Motors then sought this administrative action.

RICH MOTORS' CONTENTIONS
International Harvester in 1972 attempted to install a dealership in neighboring Delray Beach. Rich contends it informally protested the action to International, but the complaints were ignored. Rich formally complained to the Department of Highway Safety and Motor Vehicles, under another subsection of Section 320.641. John Calvin, the same director who heard this proceeding, granted the application for the Delray Beach dealership following a hearing in October, 1973. Rich contends it was only then that the relationship between the parties began to deteriorate, as reflected by International Harvester's evaluations of Rich Motors. This culminated in the August 21, 1975 notice to Rich of International's intention to cancel the franchise agreement. Rich further contends International had attempted to coerce it to find new and expanded facilities, with a much greater investment in inventory and fixed costs. In view of the economic data available to Rich, its opposition to International Harvester's pressures for greater investment was reasonable. International Harvester's notice of cancellation was the result of Rich Motor's reasonable refusal to comply with demands concerning increased investment in inventory and premises. Rich continues the criteria upon which International Harvester relied to justify the cancellation was applied to it in a biased manner compared to the treatment of other franchised dealers of International since there were other dealerships in Florida and in the region with similar physical plants and below average market penetration. Such other dealerships were not similarly singled out for cancellation.

INTERNATIONAL HARVESTER'S CONTENTIONS
International refers to the following evidence in support of its termination: At the time the new franchise agreements were executed in 1971, the facilities at Rich Motors were then deemed satisfactory but were considered to need improvement for future growth. In March, 1972, prior to Rich's protest of the new dealership, both market penetration and advertising promotion were rated unsatisfactory. In January, 1973, Rich's market penetration, inventory and advertising were all rated unsatisfactory. Sales possibilities for the area in 1973 were calculated by International to be roughly $2,000,000.00. Rich's sales were only $1,400,000.00 or about 70% of the estimated sales potential. International also calculated three to five acres of land were needed for an adequate facility to handle the trade area while Rich only had one and one-tenth acres. From 1972 to 1973 the truck market in Rich's trade area grew 84% overall. Medium duty truck sales grew 59% while heavy duty truck sales grew 110%. Rich also refused to install a new identification *147 sign approved by International Harvester. Although Rich was International's heavy duty truck dealer for the area, it refused to stock any heavy duty trucks. Any such sales were by special order.
Market penetration of Rich Motors was measured by International using the R.L. Polk compilation of registrations. International's data showed 265 new heavy duty trucks of all makes registered in Rich's trade area in 1973. Rich Motors sold 16 or 6%. Other key market International Harvester dealers in Florida averaged 15.3%. Average sales from all southeastern states were 19.2%. Twenty-eight International Harvester trucks were delivered in Rich's trade area with Rich accounting for only 16.
Three hundred forty-one new medium duty trucks of all makes were registered in the trade area during 1973. Rich reported sales of 29 International Harvester trucks or 8.5%. The key market average was 13.9%, while the regional average was 12.2%. Rich's sales of 29 trucks were less than half the 67 new International medium duty trucks registered in the area for 1973. Its sales of light duty trucks was, however, competitive. Rich sold 56 of the 3,602 light duty trucks of all makes registered in the trade area in 1973, or 1.3%. The key market average was 1.7% and the regional average 1.6%.
During 1974, 170 heavy duty trucks were registered in Rich's trade area. Rich sold 7 or 4.1%. The regional average was 19.5% and the key market average was 19.6%. Rich sold only seven of the 24 International Harvester heavy duty trucks registered in 1974. Of 205 new medium duty trucks registered in 1974, Rich sold 22 or 10.7%. The regional average was 14% and the key market average was 21.7%. Figures for the first quarter of 1975 revealed about the same level of market penetration by Rich for heavy duty and medium duty trucks as the preceding year.
Rich Motors was also required by the contract's terms to advertise sufficiently International's products. International calculated the national average spent on advertising by motor vehicle dealers is one-half of 1% of the total operating budget. Rich spent only one-tenth of one percent or about 20% of what the average motor vehicle dealer spends. Moreover full use was not made of the cooperative advertising programs with the manufacturer, of which International agreed to provide one-half the cost.

AGENCY ACTION
The Director rejected the proposed findings of fact submitted by International as summarized above. The proposed findings of Rich Motors were adopted in full.[1] The cancellation of the franchise agreement was found to be done in bad faith by the manufacturer, constituting an unfair cancellation under Sections 320.64(7), (8) and 320.641. The Director ordered Rich Motors to continue to act as the licensed International Harvester dealer in West Palm Beach under all present contractual agreements.

ANALYSIS
Sections 320.60-70 were enacted as part of a legislative scheme to insure fair dealing at all levels between motor vehicle manufacturers, the dealers and the consuming public. Section 320.641 specifically deals with unfair cancellations of franchise agreements and provides in subsection (3) for administrative review by the Director. The only criterion for agency review under Section 320.641(3) is whether the franchise agreement was unfairly cancelled. In permitting such review, it is obvious the legislative intent was to redress the economic imbalance which customarily exists between national manufacturers and local dealers. A second reason for agency review is to protect dealerships from arbitrary and discriminatory action when manufacturers seek to impose the franchise agreement's broad requirements upon dealers as a pretext *148 to terminate. Another reason, as alleged here by Rich, is when the manufacturer coerces a dealer to buy more inventory or make more expenditures it would not make but for fear of termination of its franchise. It is not, however, coercion for the manufacturer to attempt to enforce the valid contractual obligations of another party. We must therefore attempt to determine from the evidence the motives leading to International's decision to cancel.
We are again faced, as in Pasco County School Board v. PERC, 353 So.2d 108 (Fla. 1st DCA 1977), and Columbia County Board of Public Instruction, 353 So.2d 127 (Fla. 1st DCA 1977), with the difficult problem of determining the subjective intent of a party. As in Pasco County, we adopt the United States Supreme Court's reasoning in Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), as the proper test for determining such intent.
Contrary to the argument in the Director's brief, it is Rich Motors which has the initial burden of proof to show by a preponderance of the evidence the unfairness of International's decision to terminate the franchise agreement.[2] The burden, following a prima facie showing of bad faith, shifts to International Harvester to show by a preponderance of the evidence it would have reached the same decision even in the absence of the alleged bad faith. Mt. Healthy, supra, at 286, 97 S.Ct. 568.
It is questionable whether Rich Motors, by its bald assertion International Harvester desired termination of the dealership after Rich had protested the neighboring Delray Beach dealership, has made a prima facie showing of unfairness. Nevertheless we find the objective data introduced by International Harvester, and substantially uncontradicted by Rich Motors, is so overwhelming as to establish an independent reason for termination of the contract.[3]
The Director rejected the figures submitted by International Harvester, holding (1) the evidence and testimony presented did not establish why a certain level of market penetration should justify the termination of the franchise agreements; (2) the yearly truck registration figures offered are at variance with the actual sales and the physical location of the trucks in this particular trade area; (3) International failed to consider specific factors and individual equities of the dealer in applying its criteria.
These reasons are not supported by the evidence. First, Rich's market penetration was compared not only with other International dealers in the region but also with dealers in similar or "key" markets. The evidence was unrefuted that R.L. Polk figures are used by most, if not all, motor vehicle manufacturer in grading dealer performance.
Secondly, yearly truck registration figures are more illuminating in showing Rich's market share. International's market is calculated by the number of its trucks registered in the trade area as a percentage of the total trucks registered. But Rich sold only a portion of new International trucks within the trade area. As listed above, only 16 of the 28 heavy duty International trucks registered in 1973 in the area were sold by Rich. Only 29 of the 67 new medium duty trucks registered were sold by Rich. This indicates other International *149 dealers were successfully selling trucks to customers in Rich's trade area.[4]
Thirdly, the Director's finding that specific factors and individual equities of the dealer were not considered is contradicted by the testimony of Fred Jennings, International's regional business manager:
"We compare as outlined in the Sales and Service Agreement by using the R.L. Polk lists. We don't specify R.L. Polk but we specify those particular kinds of lists that we compare. We compare him to other dealers in the area. We compare him to dealers in similar markets. We compare him to dealers all over the United States and we make every comparison we can think of to make before we tell a dealer that he is unsatisfactory."
We conclude it was International's consideration of Rich's peculiar market situation which led to the termination. There are dealers in the state with the same or worse facilities and dealers with a lower market penetration. None have such a large trade area. If such dealers sold very few trucks it would not make a great deal of difference. But Rich's failure to be competitive in a large potential market means lost sales on a large number of units. This was International's legitimate business concern.
We find International Harvester's decision to terminate in accordance with the franchise agreement between the parties. Any prima facie showing of unfairness by Rich Motors was clearly rebutted by the objective data submitted by International.
The Director's order is REVERSED.
MILLS, J., concurs.
BOYER, Acting C.J., dissents.
BOYER, Acting Chief Judge, dissenting.
Were we the initial reviewing forum with the duty and prerogative of making findings of fact I would be in complete agreement with my brother judges. I concur that my own view of the evidence is that Rich failed to discharge its responsibilities. However, as I conceive the law to be, it was the function of the Director to make findings of fact and a final determination based thereon. I am of the view that although I readily concede that I would have found contra, nevertheless, the Director made his determination based upon substantial competent evidence. I would accordingly affirm.
NOTES
[1] The Director failed to consider International's proposed findings of facts in his original order. We remanded for entry of a proper order as required by § 120.59(2), Fla. Stat. (1975) and § 120.68(8), Fla. Stat. (Supp. 1976).
[2] Health & R.S. v. Career Serv. Comm., 289 So.2d 412, 415 (Fla. 4th DCA 1974).
[3] As stated above, we adopted the reasoning in Mt. Healthy when considering a public employer's alleged bad faith leading to the decision not to renew certain school teachers' contracts in Pasco County. This is perhaps not as sensitive an area as public labor relations. There is here not the aura of First Amendment and Florida constitutional rights of speech and association as in labor relations cases. Nor are the parties here in the necessarily adversary relationship of unions and employers. The aims of the manufacturer and dealer are basically the same  to make a profit. It makes less sense to attribute a bad motive to a manufacturer when the relationship with the dealer is so obviously symbiotic.
[4] Rich put on no evidence showing such encroachment was attributable to the manufacturer or was done with bad motives.