James E. DEAS and Peterbilt of Florida, Inc., a Florida Corporation, Plaintiffs-Appellants,

v.

PACCAR, INC., a Delaware Corporation, Defendant-Appellee.

No. 83–3182.

United States Court of Appeals, Eleventh Circuit.

Nov. 14, 1985.

John A. DeVault, III, Jacksonville, Fla., for plaintiffs-appellants.

Eli H. Subin, John M. Brennan, Subin, Shams, Rosenbluth & Moran, Orlando, Fla., for defendant-appellee.

Before RONEY and CLARK, Circuit Judges, and SIMPSON, Senior Circuit Judge.

CLARK, Circuit Judge:

This is an appeal by James E. Deas (Deas) and Peterbilt of Florida, Inc. (P.O.F.) from an order granting PACCAR, Inc. (PACCAR) a new trial. Deas is the President and sole stockholder of P.O.F., formerly an exclusive Peterbilt truck dealer. PACCAR is the manufacturer of Peterbilt Trucks. One of PACCAR's divisions is Peterbilt Motors Company (Peterbilt).

Deas and P.O.F. filed this action against PACCAR, Inc. for: (1) violation of the Federal and Florida Dealer Day in Court Acts; (2) fraud with respect to the nondisclosure of facts regarding prospective loans, supplies of new trucks for resale, and P.O.F.'s status as a dealer; and (3) tortiously interfering with P.O.F.'s business relationships. P.O.F.'s claims based on the Federal and Florida Acts and Deas' claim of tortious interference with a prospective business relationship were the only claims submitted to the jury. The jury found that PACCAR, through its Peterbilt Motors Company Division, violated the Florida and Federal Acts and tortiously interfered with a prospective business relationship held by Deas.

PACCAR filed a motion for judgment notwithstanding the verdict (J.N.O.V.) and an alternative motion for a new trial. The district court, after a hearing, denied the motion for J.N.O.V. and granted PACCAR's alternative motion for a new trial. In its order, the court stated:

> It is this Court's opinion that the admission of Dr. Westbrook's testimony (the expert who testified on behalf of plaintiff) as support for both liability and damages was in error in that it was completely speculative. Without such evidence the plaintiff could not have prevailed. . . .

*Record,* Vol. 13 at 3188.

Deas and P.O.F. requested the court to enter a judgment notwithstanding the verdict so that an immediate appeal could be taken. The plaintiffs stated that they could not establish any better case on retrial and that they could not afford a retrial. They thus wanted to win or lose based on the record made at trial. The court granted the motion for judgment notwithstanding the verdict and PACCAR's alternative motion for a new trial. The procedural aspect of this appeal is discussed *infra* in § II.

## I. FACTS

Deas and a co-partner purchased a truck dealership in Orlando in 1966. At that time, the company operated under a different name and was not an exclusive Peterbilt distributor.

In 1970, Deas became the president and sole stockholder of the company. With the permission of Peterbilt, Deas changed the dealership name to Peterbilt of Florida and thereafter sold Peterbilt Trucks exclusively.[1] The initial distributor's contract between Deas and Peterbilt was signed in February, 1971 and could be terminated by either party by giving thirty days notice.

In 1971 and 1972, Peterbilt encouraged Deas to sign a new distributor contract and to expand to other markets in Florida. Although Deas objected to certain provisions of the contract and to the plans for expansion, he eventually signed the new contract and in 1973 embarked on an expansion program which his accountant had advised was not prudent. The contract provided that additional facilities would be necessary

---

1. The contract did not require Deas to sell Peterbilt Trucks exclusively. The evidence demonstrated that several Peterbilt dealers sold other brands.

when required and did not obligate Peterbilt to lend any financial support to P.O.F.

Deas testified that he believed that PACCAR would provide him with all of the trucks he needed and with financial assistance when he reluctantly agreed to expand. He related that he discussed the expansion efforts with PACCAR's General Manager and General Marketing Manager. They told him that it was necessary for him to expand his operation so the company could achieve greater market penetration. Deas responded that P.O.F. was centrally located, that he did not have the money for the proposed expansion, and that more trucks would be needed. According to Deas, they assured him that he would be able to obtain all of the trucks he needed and that he would receive assistance in financing. *Record* Vol. 1 at 194. Benny L. Bailey, PACCAR's Eastern Region Credit Manager, corroborated Deas' opinion about obtaining financial assistance during the expansion. Although he also indicated that Deas probably misunderstood the statements of PACCAR's representatives, he testified that Deas informed him that Deas had been offered financial assistance. *Record,* Vol. 24 at 1238.[2]

Bailey convinced Deas to apply for wholesale financing from Associates Finance (Associates).[3] As a result, Deas and Associates entered into an agreement in which Associates extended wholesale financing so that P.O.F. could obtain its inventory. *Record,* Vol. 20 at 220–221. Deas did not receive any direct financial assistance from Peterbilt.

From 1971 to 1974 P.O.F. received outstanding performance awards from Peterbilt. However, P.O.F.'s subsequent financial performance was not as outstanding. P.O.F. had a negative net worth from 1975 to 1978.[4] Its accountant, Carson Eddy, testified that P.O.F.'s financial problems were the result of a lack of operating capital. Eddy also testified that P.O.F.'s accounting procedures were deficient; although, he did not feel they affected P.O.F.'s profits.[5]

Eddy rendered his opinion about the causes of P.O.F.'s financial condition:

In 1974 and '75, I believe they had some problems with strikes at the factory which caused Mr. Deas not to have enough trucks available for sale. I think that was during 1970—I can't recall the exact date—I think it was '73 and '74 was the strike.

Right after that, they went on allocations, I believe, and weren't able—they weren't able to get enough trucks to sell and had too much overhead with all the branches.

. . . .

[B]y using internal capital at the time for expansion, at the time that recession hit, they did not have internal funds available to carry on those operations; and therefore, had to go to outside short-term lending at very high interest rates at that time.

*Record,* Vol. 23 at 941, 943.

PACCAR's Eastern Region Credit Manager had a similar observation regarding the cause of P.O.F.'s financial problems:

QUESTION: Did you investigate the source of the problem?
ANSWER: Yes.

---

2. The correspondence between Deas and the Peterbilt managers demonstrates that financial assistance was discussed frequently. Plaintiff's Exhibits 18, 25, 26, 133, 139.

3. Associates had a repurchase agreement with Peterbilt in which Peterbilt would repurchase any new trucks that had to be repossessed because of a dealers default on a wholesale financing. The contract was beneficial to PACCAR and Peterbilt dealers because it induced Associates to furnish wholesale financing to the dealers. It was beneficial to Associates because it provided Associates with an opportunity to pro-

vide financing to retail customers. *Record,* Vol. 24 at 1235.

4. PACCAR's Eastern Region Credit Manager testified that P.O.F. had not had serious cash flow problems prior to this period. *Record,* Vol. 24 at 1244.

5. During this period P.O.F. also wrote several checks to PACCAR and Associates for which there were insufficient funds in its bank account. It also collected funds for vehicles sold and did not pay Associates.

QUESTION: What did you determine? ANSWER: That it developed over a period of time beginning with a shortage of trucks to sell in 1975 and subsequently carried into 1976, creating the shortage where he couldn't pay a parts statement on a monthly basis....

*Record* Vol. 24 at 1244.

In January, 1975 Deas contacted Joseph Dunn, the General Manager of the Peterbilt Division, because P.O.F.'s distributor's contract was near the date of expiration. On March 20, 1975, Dunn recommended that the contract be renewed for a three year term. *Record,* Vol. 24 at 1208.[6] Dunn left the position of General Manager in August, 1975 and was replaced by Ug Rohr.

When Rohr became General Manager he apparently brought with him a change of philosophy with regard to the renewal of distributor's contracts in general and P.O.F.'s contract in particular.[7] One employee observed that Rohr's policy was to eliminate all dealers who were not selling an adequate amount of trucks and who were having financial problems. *Record,* Vol. 24 at 1251–52. Under Rohr's administration, several memos regarding the Florida market and P.O.F.'s performance were generated. The memos directed employees to check on getting new dealers in Florida; suggested that Peterbilt might need to develop a plan to terminate amicably its relationship with P.O.F.; and advised Rohr to seek legal assistance in order to determine the documentation needed to support a cancellation of P.O.F.'s contract.[8] Deas stated that he was unaware of Peterbilt's concerns regarding P.O.F.'s performance.

Deas testified that he received the three-year renewal contract on February 19, 1976, one year after it had been approved.[9] However, the renewal contract was dated as being signed on December 15, 1975.

The 1975 distributor's contract provided that the distributor would "maintain a sales and service organization which will be adequate to develop the potential of his market area ..." and at "such time as sales show the requirement for additional facilities within the market area, the distributor will be expected to establish outlets in such locations." Plaintiff's Exhibit 68 at 1. The contract also required P.O.F. to invest "working capital and maintain lines of credit necessary to realize the full potential of [its] market area." *Id.* Peterbilt agreed to "use its best efforts to make shipments on or before the dates specified in orders accepted from the Distributor" but did not agree to be responsible "for failure to deliver goods on time or to fill orders where prevented by ... strike or labor disturbances ... or if the demand for goods [exceeded Peterbilt's] available supply...." *Id.* at 2.

Presumably, strikes and the increased demand for trucks caused Peterbilt to allocate trucks to its dealers from 1975–76 until 1977–78.[10] Deas was disturbed with his truck quotas because he felt they were insufficient to allow him to operate profitably. Peterbilt's Southeastern Sales Manager, however, testified that the allocation of trucks prevented all of the dealers in his region from obtaining the number of trucks ordered.[11]

**6.** According to Dunn, the only other item to be completed after his approval was the signing of the formal contract by Deas and himself. Dunn did not know why the signing of the contract was delayed.

**7.** It appears that Deas was never a "favorite" of Peterbilt. PACCAR and Peterbilt employees testified that he was a "difficult dealer" to get along with and that his facilities were not representative of an exclusive Peterbilt dealer with respect to appearance, design, and size. *See, e.g., Record,* Vol. 24 at 1188; 1211–12; 1232–33.

**8.** Plaintiff's Exhibits 71–75.

**9.** *Record,* Vol. 21 at 306. Deas' testimony was corroborated by a Dealer Contact Report, which indicated that contact was made with the dealer on February 19 and 20, 1976. Tom Root, who was Southeast Dealer Sales Manager, stated that he delivered the signed Peterbilt three-year contract to Deas.

**10.** *Record,* Vol. 24 at 1191, 1199. The record is not entirely clear on the reasons for the allocation system or the exact date upon which the allocation system was instituted. However, the issue of the need to allocate was not in dispute.

**11.** *Id.* at 1198.

Deas testified that in January, 1978 he was forced to close one of his four facilities because he could not obtain sufficient equipment to make a profit.[12] Rohr responded to Deas' action by deleting several South Florida counties from Deas' market and by instituting a corresponding reduction of Deas' sales quota.[13] As a result of these actions, P.O.F. sued Peterbilt for the return of its South Florida territory.

In December, 1977 Associates notified Deas of its intention to cancel P.O.F.'s new truck wholesale line of credit because Deas had changed his sales efforts from retail customers (upon which Associates made the bulk of its money) to wholesale customers. Associates extended the date of cancellation to 1978 in order to coincide with the term of P.O.F.'s distributor contract.

It was during this stormy period that P.O.F.'s distributor contract was near the date of its expiration. Because Deas had not obtained alternate financing, Peterbilt conditioned a one-year renewal of the dealership on P.O.F.'s improving its financial condition and obtaining new financing.[14]

As a last attempt to improve P.O.F.'s financial position, Deas entered into negotiations with a Peterbilt dealer named Wendell Doonan.[15] Deas' proposal, which was subject to Peterbilt's approval, was that Doonan would purchase a piece of Deas' property for $440,000 and assume P.O.F.'s Tampa sales territory. Deas informed Rohr of the proposal.

The deal between Deas and Doonan was never executed, primarily because of a call to Doonan from a PACCAR Vice President advising him not to develop his operations in Tampa.[16] Because P.O.F. did not obtain inventory financing for the one-year term of its proposed renewal, PACCAR did not renew P.O.F.'s contract.[17]

## II. THE PROCEDURAL BACKGROUND

This case comes to us on appeal with an unusual procedural history. As mentioned previously, the district court initially granted PACCAR's motion for a new trial and denied its motion for judgment notwithstanding the verdict. Plaintiffs then filed a Rule 60 motion, asking the court to enter a judgment notwithstanding the verdict so they could take an immediate appeal. PACCAR agreed to the procedure. Although the court recognized that the judgment notwithstanding the verdict was a harsh remedy under the circumstances, it granted the motion and the alternate motion for a new trial.

The procedural history in *National Polymer Products, Inc. v. Borg-Warner Corporation*, 660 F.2d 171 (6th Cir.1981) is almost identical to this case. In *National Polymer*, the defendant moved for a judgment notwithstanding the verdict, a new trial, or in the alternative a remittitur. The court considered the motion for judgment notwithstanding the verdict to present a close question; however, it ultimately granted the motion for a new trial. National Polymer subsequently filed a Rule 60 motion asking the court to correct its memorandum decision by entering, among other things, a judgment notwithstanding the verdict. National Polymer admitted that its reason for seeking a judgment notwith-

---

12. *Record*, Vol. 21 at 319–20.

13. Plaintiff's Exhibit 129.

14. Plaintiff's Exhibit 171.

15. Deas claims that if its financial position had improved, Associates would have reinstated its wholesale line of credit. PACCAR points out that Associates did not cancel the credit because of Deas' financial condition, but because P.O.F. stopped selling retail accounts.

16. Doonan discussed the conversation:
Joe called me one day and told me he wished I'd back off, that he felt like I had all the eggs in one basket and he felt like I'd be a lot better off—he called me as a personal friend, not as Joe Dunn, Manager of Peterbilt/Kenworth.
He said, "Hey, me and you is friends, have been friends for a long time. I just wish you would back off. You're a very valuable man in Great Bend, Kansas, but you could get yourself spread too thin and get yourself in trouble in Tampa, Florida." That probably was my turning point on thinking about going to Tampa.
*Record* Vol. 24 at 1409.

17. Plaintiff's Exhibit 190.

standing the verdict was that it wanted to obtain immediate appellate review of the trial court's decision.

Citing *Thomsen v. Cayser,* 243 U.S. 66, 83, 37 S.Ct. 353, 358, 61 L.Ed. 597 (1917), the court of appeals found that the procedure utilized was permissible.

> ... "The plaintiffs did not consent to a judgment against them, but only that, if there was to be such a judgment, it should be final in form instead of interlocutory, so that they might come to this court without further delay." ...

Here, the lower court order granting a new trial was interlocutory and unappealable. National Polymer persuaded the trial court to change its verdict to reflect its reasoning. That alteration produced a final judgment, a dismissal, allowing this appeal to be maintained.

*Id.* at 177 (citations omitted).

We accept jurisdiction in this case since the district court entered a J.N.O.V. and ordered a new trial, the J.N.O.V. having been solicited by appellant to secure an appeal. We do not fully accept the Sixth Circuit's method of reviewing the trial record and dispositive orders. In *National Polymer, supra,* that Circuit reviewed the case using two standards of review. When the standard applicable to a J.N.O.V. was applied, the court found the district court erred; yet, when it applied the standard applicable to the grant of a new trial, it found that the district court did not err and returned the case for another trial. The result was that the Circuit permitted appellant to confer appellate jurisdiction upon the court pursuant to its consent that the district court change its denial of a J.N.O.V. to a grant of a J.N.O.V.

The scenario is the same here. In their oral argument, in support of their motion to enter judgment for the defendant on both grounds, counsel stated:

> We have represented in our Motion that we're satisfied with the Brief we've presented. That because of the circumstances of these Plaintiffs, we're unable to go forward with the expense of a new trial. We further stated that if we were to go on with a new trial, we would present the same testimony upon which we relied at the initial case and including that of Dr. Westbrook, which if this Court's ruling was correct and this Court or any other Court is consistent with the Court's ruling, would be required to grant a directed verdict.
>
> We submit then, Your Honor, that in the proper administration of justice, it is far better for this Court and for the parties to have this matter finally and conclusively as determined by the Court of Appeals on now a full Record, after a full hearing, argument and a Jury verdict.

*Record,* Vol. 16 at 6–7.

Normally the grant of a new trial is an interlocutory order, not subject to appellate review unless coupled with the grant of a J.N.O.V. as provided in Fed.R.Civ.P. 50(c). While we accept jurisdiction of this appeal, we refuse to apply the J.N.O.V. standard but instead apply the less strict standard of review used in determining whether the district court erred in granting the new trial. In other words, we allow the appellant to consent to the grant of the J.N.O.V. as a vehicle to make the judgment final and to reach this court. However, we review only the ruling by the district court which was initially adverse to the plaintiff/appellant below, that is, the grant of a new trial. Fairness to both parties and the district court dictate this method of review.

The standard of review applicable to the grant of a new trial is generally said to be that of a determination of whether the district court abused its discretion. However, this general principle is dependent largely upon the basis of the district court's grant of the new trial. *See Rabun v. Kimberly-Clark Corp.,* 678 F.2d 1053, 1060 (11th Cir.1982), and *Williams v. City of Valdosta,,* 689 F.2d 964, 972 (11th Cir. 1982). Where the grant is on the ground that the verdict is against the weight of the evidence, we exercise close scrutiny out of deference to the right of a litigant to have a jury determination of the facts. *Massey v. Gulf Oil Corp.,* 508 F.2d 92, 94–95 (5th Cir.1975). We have said that there are some gradations in the strictness of our

review in those instances where the issues are highly complex, being more strict in our review when the issues are simple and the outcome largely dependent upon the credibility of witnesses. *See Williams v. City of Valdosta, supra,* at 974.

Additionally, there is a distinction between a new trial awarded because the verdict was against the weight of the evidence and one awarded for other reasons. As adopted in *O'Neil v. W.R. Grace & Co.,* 410 F.2d 908 (5th Cir.1969):

New trials granted because (1) a jury verdict is against the weight of the evidence may be sharply distinguished from (2) new trials ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence. In the first instance given it is the jury itself which fails properly to perform the functions confided to it by law. In the latter instances something occurred in the course of the trial which resulted or which may have resulted in the jury receiving a distorted, incorrect, or an incomplete view of the operative facts, or some undesirable element obtruded itself into the proceedings creating a condition whereby the giving of a just verdict was rendered difficult or impossible. In the latter instances, (2), supra, the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control. Under these conditions there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial.

But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury.... It then becomes the duty of the appellate tribunal to exer-

cise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial....

*Id.* at 914 (quoting from *Lind v. Schenley Industries, Inc.,* 278 F.2d 79 (3d Cir.1960), *cert. denied* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).

In this case it is clear that the trial court granted a new trial for several reasons. In response to a suggestion that the new trial had been granted solely on evidentiary grounds the district court responded:

In the first place, I think the record is clear that I granted a motion for a new trial for a number of reasons—

*Record* Vol. 16 at 14–15; *see also Record* Vol. 17 at 36–45 (various reasons for grant of new trial); *Record,* Vol. 13 at 3188 (written order).

The court pointed out that *International Harvester Company v. Calvin,* 353 So.2d 144 (Fla.Dist.Ct.App.1977), required an additional instruction to the effect that "if there was a good reason for the nonrenewal that then even if there were other grounds which were not priority that the valid reason would have precluded recovery under the Florida Act." *Record* Vol. 17 at 43. The court indicated that it should have given an instruction on the mitigation of damages requirement. However, it did not base its ruling on this factor alone.

In addition, the court found that several essential factors were not clearly shown by either party. Some of these factors were: (1) the total number of trucks that were produced and available to P.O.F.; (2) the reasons for the quota system and whether Peterbilt deliberately allocated less trucks than it could have allocated under the system; and (3) the effect that the strikes had on deliveries and allocations. The court was also concerned that neither party had presented sufficient evidence with respect to the amount of profits that could have been generated or lost in the Fort Lauderdale market that was taken from P.O.F.

The court found several deficiencies in both of the experts' testimony with respect to discrimination in delivery both as to the

number of trucks allocated and the timing of deliveries.[18] The court was concerned that the appellant's expert chose to select comparative dealers based on whether the expert thought they received "favored treatment" and that the expert had selected a dealer that was not in the same region as P.O.F.[19]

The court also pointed out that the raw figures indicated that P.O.F. received trucks faster than other dealers. The court concluded that when the appellant's expert added computations there was a difference in delivery that was so insignificant that it became unimportant.

On the interference with a prospective business relationship claim, the court found that if the property had been sold to Doonan, the profits generated would have been insufficient to pay the debts owed and that there would not have been any money left to place in the business. The court felt it was a distortion of the evidence to advance a contrary contention.

After reviewing the thrust of the district court's order, it is obvious that the new trial was not ordered solely because the jury verdict was against the clear weight of the evidence. This is a case where a combination of factors, which could have caused the jury to reach a possible erroneous verdict, led the court to conclude that a new trial was necessary. Under these circumstances, the district court was allowed wide discretion in granting the new trial. *See O'Neil v. W.R. Grace & Co.,* 410 F.2d 908, 914 (5th Cir.1969).

## III. THE JURY INSTRUCTIONS UNDER THE FLORIDA ACT

We now address the district court's failure to instruct the jury on the burden of proof under the Florida Act in accordance with *International Harvester Company v. Calvin,* 353 So.2d 144 (Fla.Dist.Ct.App. 1977). We have recently had the opportunity to examine the Florida Act in *Dick Winning Chrysler v. Chrysler Motors Corporation,* 750 F.2d 895 (11th Cir.1985). In *Dick Winning* we discussed *International Harvester:*

> In *International Harvester Co.,* a truck dealer protested a manufacturer's cancellation of its franchise agreement. On review, the Florida appellate court held that the dealer had the initial burden of establishing that the manufacturer's decision to terminate the franchise agreement was unfair. The court further stated that the burden, following a prima facie showing of bad faith, shifts to the manufacturer, to show by a preponderance of the evidence that it would have reached the same decision in the absence of the alleged bad faith. *International Harvester Co.,* 353 So.2d at 148 (citing *Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568 [575], 50 L.Ed.2d 471 (1977)).
>
> After evaluating the substantial uncontroverted objective data produced by the parties, the *International Harvester* court concluded that any prima facie

---

**18.** The court stated:

> On this point [discrimination] both the evidence of the Plaintiff and the evidence of the Defendant were, I think—was considerably deficient.... It was never shown by either side on this discrimination point of how many trucks were being produced and how many actually were available to come to Peterbilt of Florida and whether Peterbilt Motor Company was deliberately allocating 125 trucks when they could have allocated 250, for example. The Plaintiff didn't show that and the Defendant didn't show that.

> *Record* Vol. 17 at 41–42.

> The court also criticized PACCAR's expert based on his past connections with PACCAR. Apparently, some of the divisions of PACCAR, such as Peterbilt, were major customers of the

expert witness and provided the witness with a substantial amount of income.

**19.** On the method of selecting comparative dealers, the court concluded:

> Of all of the numerous dealers instead of picking them at random he just picked four that he suspected got favor [sic] treatment which might show that those four got favor [sic] treatment but by comparing Peterbilt of Florida to them would not necessarily come up with the—could not come up with the conclusion that Peterbilt of Florida was discriminated against as to the average dealer but only that it was discriminated against as to a favored dealer. One of these dealers was not in the southeast section.

> *Record* Vol. 17 at 41.

showing of unfairness by the dealer, Rich Motors, was clearly rebutted by the objective data submitted by the manufacturer. The court concluded that International Harvester's decision to terminate Rich Motors was in accordance with the parties' franchise agreement. Likewise, we find that Chrysler Motors' decision to terminate Winning Chrysler was in accordance with the parties' franchise agreement, and Winning Chrysler has failed to prove that Chrysler Motors imposed any "unfairness" upon the dealership.

*Id.* at 898–99. An examination of the district court's instruction regarding the Florida Act demonstrates that the jury was not instructed on PACCAR's burden of proof as set forth in *International Harvester. See Record* Vol. 29 at 2770–76. Thus, there is no assurance that the jury applied the appropriate burden of proof. Because PACCAR did not admit the appellants' prima facie case and thus assume the burden of proof, it was entitled to have the jury charged on this critical aspect of its case.

"The question on appeal is not whether an instruction was faultless in every respect, but whether the jury, considering the instruction as a whole was misled.... Thus, only in those cases where the reviewing court has a substantial doubt whether the jury was fairly guided in its deliberations should the judgment be disturbed." *Mid-Texas Communications Systems, Inc. v. American Telephone and Telegraph Company,* 615 F.2d 1372, 1390 n. 16 (5th Cir.1980), *cert. denied* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980) (citations omitted).

The appellants essentially argue that the failure to instruct on the burden of proof

was harmless.[20] We disagree. The failure to instruct on PACCAR's burden of proof was too central to be harmless. To hold otherwise "would be to abrogate the district court's duty to instruct the jury accurately." *Id.* at 1391 n. 16.

■ We have ordered a new trial where "the charge given on burden of proof was in error and was prejudicial to the appellant." *Phillips v. State Farm Mutual Automobile Insurance Company,* 437 F.2d 365, 368 (5th Cir.1971). In this case, the failure to instruct the jury on the burden of proof was prejudicial. Moreover, we have substantial doubts that the jury was completely guided during its deliberations. Thus, we hold that the district court did not abuse its discretion when it granted a new trial due to its failure to instruct the jury on the burden of proof under the Florida Act as set forth in *International Harvester.*

## IV. THE FEDERAL DEALERS' DAY IN COURT ACT

Our independent examination of the record has led us to conclude that the evidence before the jury on the discrimination issue was deficient. One obvious problem with the evidence was the failure of the appellants' expert to present sufficient facts demonstrating that the dealers, with whom P.O.F.'s deliveries were compared, were similar to P.O.F.

The appellants' expert selected dealers whom the expert thought received "favored treatment" and failed to restrict his selection to dealers located in the southeastern region.[21] In addition, the expert examined some of the more profitable Peterbilt dealers.[22]

---

**20.** The appellants urge that the failure to instruct was favorable to PACCAR "given the instruction at the beginning of trial that PACCAR could not be liable if it had 'just cause' for 'failing to renew or refusing to renew' POF's contract ... [and] the general instruction on burden of proof...." *Appellant's Reply Brief* at 23–24. It is further contended that the charge did not mislead the jury and that the jury understood the issues it was to apply in arriving at its decision.

**21.** PACCAR's expert stated that the southeast region consisted of Alabama, Georgia, Florida, Mississippi, Kentucky, South Carolina, North Carolina, West Virginia, and Virginia. The appellants' expert stated that he examined the southeast region as defined by Peterbilt. However, it is undisputed that one of the dealers was located in Massachusetts. *Record,* Vol. 25 at 1594.

**22.** A cursory examination of the 1977 dealer rankings with respect to the sales of parts and trucks illustrates that the dealers selected may

Although evidence of another dealer's performance is admissible and helpful in these cases, we cannot hold that a litigant can select a dealer without regard to the dealer's geographic location, size, product mix, and market potential merely because the dealer is suspected of receiving "favored treatment."[23] *See Randy's Studebaker Sales, Inc. v. Nissan Motor Corporation in U.S.A.*, 533 F.2d 510, 512 (10th Cir.1976) (dealer who contended that it had been discriminated against by the distribution and allocation of automobiles selected comparative dealers that were geographically close); *cf. Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 821 n. 8 (1st Cir.1983), *cert. denied*, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983) (In response to an argument that there was no showing that the dealerships were sufficiently similar for the comparison to be legitimate, the court noted that it was not specifically contended "that the dealerships were geographically so distant as to make them incomparable, a possibility not necessarily apparent."); *Farmington Dowel Products v. Forster Mfg. Co., Inc.*, 421 F.2d 61, 82 n. 48 (1st Cir.1970) (District court in antitrust case correctly concluded that two businesses were not sufficiently comparable based on an examination of the products manufactured, sales and distribution system, capitalization, sales and profits, and customer groups.).

■ We are unable to conclude that the appellants compared P.O.F. to similar dealers. However, there are other factors that support the district court's award of a new trial. Our review of the record demonstrates that the evidence regarding the method of allocating trucks to dealers, the causes of the allocation system, and the effect strikes and similar production delays had on the system was sparse. Although some of these factors were briefly discussed by witnesses, the jury could not have had a clear understanding of how the normal allocation system operated. As a result, the jury could not determine whether Peterbilt purposely deviated from its normal allocation system when it allocated trucks to P.O.F.

One court has established a three-part test for determining whether a manufacturer has failed to make products available to a dealer. First, the plaintiff must prove that it actually ordered more vehicles than it received.[24] Second, it must be shown

not have been sufficiently comparable. Comparative dealers are underlined on the ranking charts which are reprinted below.

Southeast Region
Performance Review

Trucks

| | | |
|---|---|---|
| 1. | Peterbilt of Knoxville | 399% |
| 2. | Ed Wright | 200% |
| 3. | Easom Truck Sales | 175% |
| 4. | Nalley Motor Trucks | 149% |
| 5. | Peterbilt of Louisiana | 129% |
| 5. | Peterbilt of Nashville | 129% |
| 6. | Trucks, Inc. | 116% |
| 7. | Peterbilt Southern | 115% |
| 8. | Peterbilt of Mississippi | 114% |
| 9. | Peterbilt of Florida | 106% |
| 10. | Dunham GMC | 89% |
| 11. | Tri-State | 82% |
| 12. | Fitzgerald | 73% |
| 13. | Dickerson GMC | 32% |
| 14. | West Virginia Trucks | 13% |
| | REGION TOTAL | 158% |

Parts

| | | |
|---|---|---|
| 1. | Trucks, Inc. | 132% |
| 2. | Peterbilt of Nashville | 129% |

Parts

| | | |
|---|---|---|
| 3. | Peterbilt Southern | 119% |
| 4. | Peterbilt of Knoxville | 116% |
| 5. | Nalley | 111% |
| 6. | Easom | 102% |
| 7. | Peterbilt of Louisiana | 97% |
| 8. | Ed Wright Trucks | 90% |
| 9. | Peterbilt of Florida | 73% |
| 10. | Dunham GMC | 70% |
| 11. | Dickerson GMC | 50% |
| 12. | Peterbilt of Mississippi | 43% |
| 13. | Key GMC—Mobile | 39% |
| 14. | Fitzgerald | 37% |
| 15. | Tri-State | 20% |
| 16. | West Virginia Trucks | 19% |
| | REGION TOTAL | 93% |

Plaintiff's Exhibit 314 (emphasis added).

**23.** By no means do we hold that all of these factors must be proven before a dealer can be found to be comparable. However, objective factors should be utilized when an expert selects comparative dealers. The factors mentioned help assure that objective measures are present during the selection process.

**24.** The fact that P.O.F. did not receive all of the trucks ordered is clear from the record.

"that the particular model vehicles ordered, but not supplied, were available for delivery, *i.e.*, there was no product shortage at the time, or if there existed a period of product shortage such as was customary in the business during the months of new model introduction ... that [the manufacturer] failed to allocate vehicles in a fair and reasonable manner." *Cecil Corley Motor Company v. General Motors Corporation*, 380 F.Supp. 819, 835 (M.D.Tenn. 1974). Third, it must be demonstrated that the manufacturer failed to make such vehicles available for the reasonable requirements of the dealer's area of sales responsibility. *Id.*

It is the second factor of the well reasoned test set forth in *Cecil Corley* that has not been developed in this case. The absence of this critical evidence made it impossible for the jury to accurately determine whether Peterbilt had acted in bad faith when it failed to supply P.O.F. with the trucks it ordered.

As the district court properly pointed out, the fact that P.O.F. failed to obtain financing, which was a valid contractual requirement, is undisputed. The only evidence regarding discrimination was that presented by both of the experts. If the experts' evidence were omitted, the remaining evidence that Peterbilt had begun to establish a file on P.O.F. in order to amicably terminate P.O.F. would be insufficient to demonstrate a lack of good faith. As stated in *Woodward v. General Motors Corporation*, 298 F.2d 121 (5th Cir.1962), the federal act does not " 'curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise.' " *Id.* at 128. Moreover, we have recently held that a dealer was properly terminated for failure to abide by the terms of its franchise agreement. *See Dick Winning Chrysler-Plymouth v. Chrysler Motors Corporation*, 750 F.2d 895, 899 (11th Cir.1985).

## V. CONCLUSION

The district court did not abuse its discretion in granting a new trial. We have tried faithfully to review the facts and the law in reaching this conclusion. Plaintiffs' suit was based essentially on the Florida and Federal Dealer Acts, which require good faith on the part of a motor vehicle manufacturer in terminating or not renewing a dealership contract. In this case PACCAR did not renew basically because P.O.F. could not provide floor plan financing. P.O.F. attempted to show that it lost its financing because of PACCAR's bad faith dealings. P.O.F.'s evidence was speculative, both substantively and as to causation. While P.O.F. increased its sales considerably in the early '70's, it was never sufficiently capitalized according to P.O.F.'s own accountant. P.O.F.'s expert described the 1975–1976 recession as particularly severe in Florida in regard to the sale of trucks. P.O.F.'s troubles began at that time. The district court's assessment of the evidence was correct when it held that the evidence that PACCAR discriminated against P.O.F. was inherently speculative, and that P.O.F.'s financial difficulties could not be attributed to this speculative discrimination.

The appellant was entitled to a new trial but waived that right to obtain an immediate review of the jury's verdict. Since we hold that the appellant was not entitled to a judgment on the jury verdict, the district court was correct in entering a judgment notwithstanding the verdict even though the court initially denied the defendant's motion. The judgment notwithstanding the verdict is AFFIRMED.