892 F.2d 75
 11 Employee Benefits Cas. 2511
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Herman WOLFF, Jr., Defendant-Appellee.
 No. 89-5551.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 2, 1989.
Decided: Dec. 12, 1989.
 
 John Stuart Bruce, First Assistant United States Attorney (Margaret Person Currin, United States Attorney, on brief), for appellant.
 Wade Marvin Smith (C. Mark Holt, Tharrington, Smith & Hargrove; N. Hunter Wyche, Jr., Smith, Debnam, Hibbert & Pahl, on brief), for appellee.
 Before POWELL, Associate Justice, United States Supreme Court, Retired, sitting by designation, PHILLIPS, Circuit Judge, and CLAUDE M. HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 The questions are whether there was sufficient evidence to sustain the convictions of Herman Wolff, Jr. on charges of fraudulent concealment of property, withholding of papers, and making a false statement in connection with a bankruptcy proceeding, and if so, whether the district court erred in conditionally granting Wolff a new trial. On the government's appeal, we conclude that the evidence was sufficient to convict Wolff on all three counts, and we therefore reverse the district court's post-verdict judgment of acquittal. But we further conclude that the district court did not abuse its discretion in conditionally granting Wolff's alternative motion for a new trial, and we therefore affirm the grant of a new trial.
 
 
 2
 * The district court's ruling that the evidence was insufficient to convict Wolff necessitates a rather detailed review of the evidence. We review independently to determine if there is substantial evidence, viewed in the light most favorable to the government, to support the finding of guilt. See Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir.1989). Our account of the facts reflects that basis of review.
 
 
 3
 Wolff, an attorney, began his representation of Watson Seafood and Poultry Company (WSP) in 1958. In that year, he drafted a defined-benefit pension trust plan for the company. Wolff handled all WSP's legal matters related to the pension trust. In 1977, he drafted an amendment to the plan, which provided that upon dissolution of the plan, any trust assets remaining after distribution to the participants "may" revert to the employer, WSP. In the early 1980's WSP began to experience financial difficulties. On March 21, 1983, Ebern Watson, Jr., WSP's president, and his brother Larry Watson, acting as the company's Board of Directors, voted to terminate the trust effective April 30, 1983, and to return to WSP trust assets remaining after the participant distributions. Larry Watson also filed with the Pension Benefit Guaranty Corporation (PBGC), on April 18, 1983, a "Notice of Intent to Terminate" form. In response to a question on this form, "Will any funds be, or have any funds been, returned to the employer? If uncertain check 'Not Applicable.' If 'Yes,' enter the estimated amount," Watson answered "$321,668." On April 21, 1983, WSP filed a voluntary petition in bankruptcy. The trustees of the pension plan, Ebern, Jr. and Larry Watson,[1] agreed to terminate the plan effective April 30, 1983.
 
 
 4
 Wolff admitted on trial that he was consulted on the pension trust termination and was aware that WSP had decided to terminate the trust. He also admitted that he knew that one of the options for distribution of residual trust funds was reversion to the company, but he denied that he knew that WSP had in fact decided to return the funds to the company. Though he testified that he attempted to obtain the termination documents, Wolff asserted that he was unable to get the documents from Ebern, Jr., and never actually saw the documents until early 1984. He did know that Ebern, Jr. was representing that money would be available to WSP from the pension trust and that the largest participants in the plan were Watson family members, who would make some funds available to the corporation.
 
 
 5
 Wolff functioned as lead attorney for WSP in the bankruptcy proceeding. Wolff's law partner, Andrew Martin, however, actually filed the bankruptcy petition and prepared most of the necessary schedules. Pursuant to bankruptcy rules, WSP filed a "Statement of Financial Affairs" (SOFA) and accompanying schedules on May 31, 1983. The filings omitted any mention of the funds from the pension trust which were to revert to WSP, and also omitted any reference to six other transactions the government would later argue should have been included.[2] Wolff testified that he was aware of or involved in each of the transactions the government alleged should have been included in the SOFA. He did prepare the real property schedules, but testified that he never saw the other SOFA schedules until 1987. Ebern, Jr. testified that Wolff had "full awareness of what the corporation was doing," that he relied on the attorney to ensure the correctness of the SOFA documents, and that Wolff was aware prior to the bankruptcy filing that WSP was going to terminate the pension trust. Ebern, Jr. signed the SOFA for the corporation; Andrew Martin also signed the documents for the law firm.
 
 
 6
 On June 2, 1983, after the SOFA filing, Wolff and Ebern, Jr. appeared with some of WSP's major creditors at an adversary hearing convened by the bankruptcy court. Ebern, Jr. testified at that hearing that the company would have approximately $320,000 from the pension overfunding available for reorganization. Regulatory approval for the termination of the trust and the distribution of the trust assets had not been received at that time; the PBGC did approve the termination in July 1983.
 
 
 7
 In August 1983, the pension fund manager sent an initial distribution check payable to the trustees, and Ebern, Jr. deposited the check in a separate trust bank account. Wolff had advised Ebern, Jr. to set up the separate bank account for the trust distributions. Throughout the summer WSP filed monthly reports with the bankruptcy court without reference to the pension trust fund or the distributions from that fund.
 
 
 8
 On October 14, 1983, the bankruptcy court appointed a trustee for WSP, citing "indifference to the orders and requirements" of the court. On October 19, 1983, the pension trust manager made the final payment from the fund in the amount of $157,956.85, but the check was mistakenly drawn to WSP instead of to the pension fund trustees. When he received the mistakenly drawn check, Ebern, Jr. called Wolff, who advised him to return the check and deposit the reissued check in the trust bank account. The fund manager reissued the check after Ebern, Jr. informed him of the error. Wolff admitted that he informed neither the trustee nor the bankruptcy court of the receipt of the check.
 
 
 9
 WSP's trustee indicated to the bankruptcy court in a December 1983 hearing attended by Wolff that he had discovered that WSP had a pension trust and that he would proceed to investigate the trust. Wolff did not offer at that time any information regarding the trust or the dissolution transactions. The trustee apparently had difficulty securing the records of the trust from Wolff.
 
 
 10
 A criminal investigation of the WSP bankruptcy began in early 1985. Ebern, Jr. eventually pled guilty to one count of knowingly and fraudulently making a false declaration by failing to disclose the pension trust monies in the SOFA, in violation of 18 U.S.C. § 152. Wolff was indicted on three counts: 1) fraudulent concealment of the pension trust residual, in violation of 18 U.S.C. §§ 152 and 2; 2) fraudulent withholding from the bankruptcy trustee of records or papers relating to the property or financial affairs of the debtor, specifically the final distribution check for $157,956.85, in violation of 18 U.S.C. §§ 152 and 2; 3) knowing falsification of material facts in connection with the filing of the SOFA with the bankruptcy court, in violation of 18 U.S.C. §§ 1001 and 2.
 
 
 11
 At trial, the government's first witness was the bankruptcy judge, who testified regarding WSP's bankruptcy proceedings and some of the orders he issued during the course of the proceedings. Counsel for Wolff did not raise a general objection to receiving the judge's testimony, but did object to specific questions, all but one of which were sustained. Near the end of the judge's testimony, the district court sent the jury out and engaged in a discussion with counsel, questioning the propriety of having a judge testify and recognizing the danger that the testimony might cross into issues of law. When questioning resumed, the United States Attorney asked the bankruptcy judge about a report concerning the pension trust that the bankruptcy trustee had prepared at the request of the bankruptcy court. In response to the attorney's final question asking what he had done after reviewing the report, the judge responded, "I transmitted it to the U.S. Attorney." Joint Appendix (J.A.) at 51.
 
 
 12
 The jury convicted defendant on all three counts. After the jury returned its verdict, defendant filed a written motion for acquittal.[3] At the hearing on the motion, Wolff's counsel for the first time objected to the bankruptcy judge's testimony, admitting that they "did not object enough" during the trial. In addition, Wolff for the first time objected to a supplemental jury instruction offered by the government which definitively established WSP's interest in the pension trust.[4] The instruction was made very near the end of the instructions:
 
 
 13
 The bankruptcy laws of the United States require a debtor to disclose [in] a statement of financial affairs and attached schedules all legal and equitable interests of the debtor and property held at the commencement of the bankruptcy case. Watson Seafood and Poultry Company had an equitable interest in the Watson Seafood and Poultry Company Pension Trust Fund at the commencement of this bankruptcy case.
 
 
 14
 J.A. at 726-27.
 
 
 15
 The district court granted defendant's motion for acquittal on all three counts, and conditionally granted Wolff's alternative motion for a new trial on all three counts.
 
 
 16
 On count one, the court ruled that there was insufficient evidence of concealment since Ebern, Jr. had disclosed the existence of the trust residual at the creditors' hearing in early June 1983. See United States v. Wolff, No. 88-7-01-CR-5, slip op. at 4 (E.D.N.C. Jan. 24, 1989). The court also ruled that the challenged instruction was "factually incorrect" because WSP did not have an interest in the pension trust at the commencement of the bankruptcy proceedings. Id. Because the effect of this instruction was to remove from the jury's consideration an essential element of proof, this constituted error "as a matter of law" that required setting aside the verdict.
 
 
 17
 On count two, the court ruled that the government had failed to prove an essential element of the crime--that the check allegedly "withheld" from the bankruptcy trustee was property of the debtor, WSP. The transaction was "lawful," and "as a matter of law" the court ruled that there was no evidence of "concealment" of WSP's property. Id. at 8. A new trial was granted conditionally "based on the joinder of this count with the other counts of the indictment for which a new trial is hereby being allowed in the alternative." Id. at 9.
 
 
 18
 The court finally ruled that there was insufficient evidence to convict on count three. The court found that Wolff could not be convicted as principal because no evidence indicated that he signed or submitted the SOFA. Id. at 11. And he could not be convicted as an aider and abettor because a fatal error in the indictment listed "Ebern Watson" as the alternative principal, not specifying "Jr." or "Sr." This error left the jury "completely ... without guidance" when the indictment did not specify whether the father or son was involved in the particular transaction the government alleged should have been included in the SOFA. Id. The court ruled that in the alternative a new trial was warranted because of "the court's charge on this count," which did identify Ebern, Jr. as the alternative principal, "and the joinder of this count with other counts on which the defendant is entitled to a judgment of acquittal, or alternatively a new trial." Id. at 13. The court also ruled that, on the authority of United States v. Zipkin, 729 F.2d 384 (6th Cir.1984), a new trial was warranted "as a matter of law," apparently as to all counts, because of the unfairly prejudicial effect of receiving the testimony of the bankruptcy judge. Id. at 14.
 
 
 19
 This appeal by the government, under 18 U.S.C. § 3731, followed.
 
 II
 
 20
 We consider first the district court's grant of Wolff's post-verdict motion for acquittal on all counts, taking the counts in turn.
 
 
 21
 * The court ruled the evidence insufficient to convict on the fraudulent concealment count, count one, on two grounds. First, that as a matter of law, WSP did not have a property interest in the pension trust residual to be "concealed." Second that, in any event, the evidence did not suffice to show fraudulent concealment of the interest in view of the open revelation of the residual's existence by Ebern, Jr. at the post-filing bankruptcy court hearing. We disagree on both points.
 
 
 22
 (1)
 
 
 23
 The district court erred in concluding that at the time the bankruptcy case was filed WSP had no property interest in the pension trust residual.
 
 
 24
 The Bankruptcy Code broadly defines "property," with limited exceptions not applicable in this case, to include "all legal or equitable interests of the debtor in property as of the commencement of the case" and as "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(1), (7). A company that reserves the right to terminate a pension plan at any time does have a property interest in any residual remaining after distribution to plan participants where the plan provides that the residual will revert to the company. See Creasy v. Coleman Furniture Corp., 763 F.2d 656, 662 (4th Cir.1985). The prospect of the termination of an overfunded pension plan and the receipt by a bankrupt company of surplus assets has been held an "off-balance sheet asset" of the debtor corporation. See In re AM International, Inc., 5 Employee Benefits Cas. (BNA) 2337, 2343 (Bankr.N.D.Ill.1984) (estimated reversion from overfunded pension appropriately included in net worth calculation by PBGC).
 
 
 25
 While the trust was a separate legal entity from WSP on the date the SOFA was filed, the trust agreement provided that funds remaining after distribution to the participants "may revert to the employer." In re AM is of course only non-binding authority, but the underlying rationale that a reversionary interest should be deemed part of the bankrupt's property is consistent with the broad definition of property in § 541. To the extent that Creasy might be distinguishable on the ground that the pension fund residuals "were to be paid over" to the bankrupt company under the terms of the plan in that case, 763 F.2d at 662, WSP's Board voted before the SOFA filings to terminate the plan and return the residual to the company. Board members Larry and Ebern Watson, Jr. were controlling trustees.
 
 
 26
 Wolff relies on several cases for the proposition that the debtor's reversionary interest did not amount to "property" under § 541, hence could not have been "concealed" under § 152, but none of the cases involved a pension trust. He relies primarily on McLean v. Central States S & S Areas Pension Fund, 762 F.2d 1204 (4th Cir.1985), arguing that WSP was like the pensioner whose beneficial interest would not be bankruptcy estate property until paid under terms of the trust, see id. at 1206. The McLean holding, however, is based on one of the exceptions to the broad definition of property in § 541, which is inapplicable here. See id.
 
 
 27
 The district court therefore erred in granting acquittal on the basis that, as a matter of law, WSP had no "property" interest in the residual trust fund to be "concealed."
 
 
 28
 (2)
 
 
 29
 The district court also erred in ruling that the evidence did not in any event suffice to prove that any such interest was in fact fraudulently concealed.
 
 
 30
 The court's ruling was based on its assessment that proof of fraudulent concealment was completely negated by Ebern, Jr.'s disclosure of the residual fund's existence at the creditors' meeting two days after the SOFA filings. While that evidence obviously was relevant and to some extent probative of the lack of fraudulent intent, it was but one item of evidence on the issue, and was not entitled to the conclusive weight assigned it by the district court. The jury obviously could have discounted the significance of this isolated disclosure for any number of rational reasons, including the fact that it was not made by Wolff himself, and that there was no direct proof that Wolff was aware of it. More important, there was abundant evidence from which the jury could rationally have inferred the requisite fraudulent intent at the critical time of the SOFA filing, even in the face of a subsequent disclosure of the asset. See United States v. Young, 339 F.2d 1003, 1004 (7th Cir.1964). The evidence tending to establish fraudulent intent at the time was of course circumstantial, but that obviously may suffice. See United States v. Shapiro, 101 F.2d 375, 377 (7th Cir.1939).
 
 
 31
 We briefly summarize the critical evidence, noting at the outset that failure to schedule assets, while not alone conclusive, is obviously the relevant starting point in proof. Beyond that evidence, there was the following evidence of Wolff's knowledge. He knew prior to the filing of the SOFA schedules that WSP was terminating the trust, that residual funds would be available after distribution to the participants in WSP's plan, and that residual funds could be directed back to the company. He also knew that Ebern, Jr. was representing that residual funds would be available for WSP's reorganization. In the face of this evidence, a jury was clearly entitled, as it presumably did, to view skeptically Wolff's contention that despite his close attorney relationship with WSP, he was basically unaware of the details of an event as significant in the company's history as its bankruptcy.
 
 
 32
 Other evidence also supports the jury's finding of criminal concealment. No mention was made of the pension trust residual in any of the monthly reports filed with the bankruptcy court. WSP's representatives failed to attend a scheduled creditors' meeting or file a timely plan of reorganization.
 
 
 33
 From all this evidence, the jury properly could find beyond a reasonable doubt that Wolff fraudulently concealed WSP's property interest in the pension trust residual.[5] The district court therefore erred in granting acquittal on count one on this basis.[6]
 
 B
 
 34
 The district court's ruling on count two that the evidence was insufficient because, as a matter of law, the check allegedly withheld from the bankruptcy trustee was not "property" of WSP is erroneous as a matter of law. Under the part of 18 U.S.C. § 152 charged in this count, the government must prove knowing and fraudulent withholding of "any recorded information, including ... documents, records, and papers, relating to the property or financial affairs of a debtor." 18 U.S.C. § 152 (emphasis added). The check was improperly drawn in that the trustees of the pension trust rather than WSP should have received the check. At a minimum the check related to WSP's "financial affairs" since the decision had been made to return the residual funds to the company.
 
 
 35
 The government also correctly notes that the district court's order refers to concealment, rather than the statutory requirement of withholding. Whether this distinction between different provisions of § 152 is meaningful when the same intent is required ("knowingly and fraudulently"), the evidence clearly establishes that Ebern, Jr. contacted Wolff when he received the check and that Wolff advised him to return the check to the trust manager. Sufficient evidence was presented from which criminal intent--whether to "conceal" or "withhold" information about the check's existence--could be inferred, including defendant's failure to notify the trustee or the court when the check was received, his failure to inform the trustee about the check when the trustee raised a specific question regarding the pension trust at the December hearing, his apparent reluctance to turn over trust records to the trustee, and the other evidence of "concealment" of the trust fund outlined above.
 
 
 36
 Wolff contends that his actions related only to the check itself and that his advice to return the check to the trust manager is the only relevant evidence on this count. With this argument he seeks to take maximum advantage of the district court's finding that his advice on this particular matter was "an accurate statement of the legal rights" of WSP and the trust, and that in toto the transaction was "lawful ... and cannot give rise to criminal liability as charged in Count Two." Slip op. at 7, 8. This attempt to limit the inquiry, however, is inappropriate when to establish statutory criminal intent almost necessarily, and properly, requires consideration of all the facts and circumstances. See Metheany v. United States, 365 F.2d 90, 92 & n. 2 (9th Cir.1966). And the district court's conclusion that this "lawful transaction" could not give rise to criminal liability seems to depend on the court's ruling that WSP had no property interest in the trust fund. Since we have held that this ruling was incorrect, it provides no support for acquitting Wolff on count two.
 
 C
 
 37
 The district court ruled that the evidence was insufficient to convict Wolff on count three because the indictment named "Ebern Watson" as the alternative principal with Wolff, and "from the evidence in the case the jury could not have distinguished between Ebern Watson, Sr. and Ebern Watson, Jr. in order to determine who was the principal." Slip op. at 12. We disagree.
 
 
 38
 The variance between the indictment and the government's proof, which attempted to establish "Ebern Watson, Jr." as defendant's principal, is not fatal and does not warrant the grant of a motion for acquittal. Rule 52(a) mandates that any variance "which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a). A variance "is not fatal unless the defendant could not have anticipated from the indictment what evidence would be presented at trial or unless the conviction based on an indictment would not bar a subsequent prosecution." 3 C. Wright, Federal Practice and Procedure: Criminal 2d § 516, at 27 (2d ed. 1982) (citing, inter alia, Berger v. United States, 295 U.S. 78 (1935)) [hereinafter C. Wright]; see also United States v. Quicksey, 525 F.2d 337, 341 (4th Cir.1975) (citing Berger for test of substantiality under Rule 52(a)).
 
 
 39
 Wolff contends that the variance here was so substantial as to constitute an "amendment" of the indictment changing its very terms, see, e.g., United States v. Beeler, 587 F.2d 340, 342 (6th Cir.1978), which must be deemed prejudicial per se and not subject to harmless error analysis. See id.; see also Stirone v. United States, 361 U.S. 212, 217 (1960) (variation which destroys defendant's right to be tried only on charges presented in indictment not treated as harmless error); cf. United States v. Odom, 736 F.2d 104, 118 (4th Cir.1984) ("Any variance between indictment and proof which does not modify the elements of the crime charged will not invalidate a conviction unless it prejudices the defendant.").
 
 
 40
 The variance between the indictment and proof in this case does not rise to the level of per se prejudice. See 3 C. Wright, § 516, at 27 (only where evidence presents facts "distinctly different" from those in the indictment). Wolff has no basis to argue that he could not be aware from the indictment that the government would attempt to link him with Ebern, Jr. in the fraud. The facts presented at trial are not distinctly different from those in the indictment, only more specific. Wolff's argument that aiding and abetting Ebern Watson is different from aiding and abetting Ebern Watson, Jr., involves a hypertechnical reading of the indictment that does not demonstrate that his substantial rights were actually affected.
 
 
 41
 Wolff seeks to find support for his claim of unfair prejudice in the district court's expressed concern that the jury "was left without guidance," and could not have distinguished between Ebern, Sr. and Ebern, Jr. to determine who was the principal. While we cannot gainsay the district court's superior vantage point in evaluating the effect of particular evidence on the jury, review of the trial transcript clearly indicates that the focus of the government's proof was defendant's relationship with Ebern, Jr.
 
 
 42
 Section 1001 of Title 18 provides that "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies ... a material fact" commits a crime. In order to establish aiding and abetting under 18 U.S.C. § 2, the government need only show that the defendant willfully associated himself in some way with the criminal venture, participated in it as he would in something he wished to bring about, and sought by his actions to make it succeed. See United States v. Eddy, 597 F.2d 430, 433 (5th Cir.1979).
 
 
 43
 The record contains substantial evidence, viewed in the light most favorable to the government, that Wolff aided and abetted Ebern Watson, Jr. in the falsification of the SOFA schedules. It is essentially undisputed that Wolff was aware of or at least involved in all the transactions the government argues should have been included in the SOFA filings. While Wolff suggests that the government did not present evidence that the SOFA schedules "unambiguously" required listing the transactions that form the basis of count three, even a superficial review of the schedules shows that at least some of the transactions clearly should have been included. The circumstantial evidence we outlined in evaluating the count one concealment element is also relevant in evaluating defendant's criminal intent under count three. The aggregate of the circumstantial evidence the government presented is sufficient to support a reasonable inference by the jury that Wolff knowingly aided Ebern, Jr. in omitting the six transactions from the SOFA. Substantial evidence thus supports the jury's finding of guilt on count three.
 
 III
 
 44
 As indicated, the district court, acting pursuant to Fed.R.Crim.P. 29(d), conditionally granted Wolff's motion for a new trial. Rule 29(d) charts the ensuing procedural path where, as here, the government then appeals from the judgment of acquittal: "[i]f ... the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered." While this rule's directive does not specify a standard of appellate review for deciding whether to "otherwise order," it is obvious that we do have an obligation to review in order to make that decision. And we think it also obvious that our review must be highly deferential in view of the wide discretion accorded district courts by Fed.R.Crim.P. 33 to "grant a new trial ... if required in the interest of justice," see United States v. McBride, 862 F.2d 1316, 1319-20 (8th Cir.1988), except, presumably, to the extent the district court's ruling was rested on specific trial errors thought to have tainted the verdict. As to these latter, we obviously owe no deference to rulings which, on plenary review, are determined themselves to be legally erroneous. But as to the grounds involving discretionary assessments of the balance of the evidence, including its credibility (as opposed to its minimal sufficiency), the possibly prejudicial effect of the admission or exclusion of evidence, or of possibly confusing instructions and the like, we owe the great deference commanded by the traditional power of trial judges sitting as "thirteenth jurors," to avoid possible miscarriages of justice by ordering new trials in criminal cases. See generally 3 C. Wright §§ 553, 556 (1982).[7]
 
 
 45
 Here, as indicated, the district court based its conditional grant of a new trial on several grounds, some related to specific counts, some to all. Specifically, the court identified its perceived erroneous instruction on count one that WSP had a property interest susceptible to concealment; the prejudicial effect of allowing the bankruptcy judge to testify on matters of law; and the possibility of jury confusion arising from the imprecision of the indictment on count three in conjunction with the court's instruction on that count.
 
 
 46
 We have previously held that, as a matter of law, the court's instruction on count one was not erroneous. This ground then drops out as a proper basis for granting a new trial as to any count. That leaves the judge's assessment of the possibility of unfair prejudice on all counts arising from the bankruptcy judge's testimony, and the possibility of jury confusion respecting Wolff's role as aider and abettor of either Ebern, Jr. or Ebern, Sr. on count three. Furthermore, we think it fairly inferable from the record that, though not specifically articulated, the judge was concerned about the weight of the evidence on the critical element of Wolff's criminal intent in respect of each count. This seems implicit in any conditional grant of new trial in conjunction with a primary ruling that the evidence not only preponderated against the party with the burden of proof, but was actually insufficient to create a triable issue for the jury. And we think this assessment is specifically implicit here in the court's concern about the possibly compelling significance of Ebern, Jr.'s open disclosure at the creditors' meeting of the pension fund residual's existence.
 
 
 47
 Were we assessing the sufficiency in isolation of any of these specifically or implicitly assigned reasons for awarding a new trial, we might have serious reservations about their adequacy. But we think that it is not appropriate to consider them in isolation. Here, as in the civil context, see, e.g., Deas v. PACCAR, Inc., 775 F.2d 1498, 1504 (11th Cir.1985), we think we owe particular deference to the district court's better vantage point for assessing their possibly cumulative impact on the jury's deliberations. See McBride, 862 F.2d at 1319-20 (affirming new trial grant on basis of cumulative effect of errors). A trial judge's superior vantage point is nowhere more certain than in assessing the overall dynamics of a trial, including such matters as the spill-over effect of particular trial court errors, the possibility of juror confusion from whatever source, and the overall "weight" of the evidence. When a new trial is granted on the announced basis of an accumulation of such factors, we should be particularly cautious about second-guessing a judgment that, all things considered, the interests of justice will be served by directing a new trial before another factfinder. In such circumstances, we think our review should not intrude much further than to inquire whether the reasons given are manifestly without any legal or factual basis in the record. We cannot say that here.
 
 
 48
 We start with the obvious fact that the district court in its overall assessment of the evidence thought the case at least an extremely close one on the issue of criminal intent--an issue critical on each of the counts. We cannot gainsay that basic assessment.
 
 
 49
 This then obviously made the court particularly sensitive to the possibility that, on that critical issue, the verdict might have been tipped in the end by improperly admitted or insufficiently cabined evidence, or by court-induced confusion on the matters at issue. Neither can we fault that general perception.
 
 
 50
 Turning to specifics, we think it sufficient for our limited review purposes to consider the district court's expressed concern about the possibility of unfair prejudice from the bankruptcy judge's wide-ranging testimony. Relying specifically on United States v. Zipkin, 729 F.2d 384 (6th Cir.1984), the district court noted a concern, also expressed in that case, that allowing a judge, though generally competent as a witness, see Fed.R.Evid. 605, to testify, as here, to the legal significance of particular conduct of a defendant might unfairly have prejudiced the defendant, by reason of the jury's according a judge's testimony undue weight on the ultimate issue of guilt. See J.A. at 46-49; Zipkin, 729 F.2d at 387; see also United States v. Young, 470 U.S. 1, 16 n. 14 (1985). Beyond this general risk of prejudice, the court also noted the bankruptcy judge's elicited testimony that after receiving the bankruptcy trustee's report on the pension trust, he "transmitted it to the U.S. Attorney." While this testimony probably did not "amount[ ] to a statement that under the applicable law the defendant was guilty," see Zipkin, 729 F.2d at 387, its potential for conveying an impression that this judge-witness considered the defendant guilty is obvious and the resulting risk of unfair prejudice equally so.[8]
 
 
 51
 Certainly we cannot say that the district court's concern about the risk of prejudice from this testimony in combination with the perceived closeness of the case on the conflicting evidence of criminal intent and the risk of juror confusion on count three, was without legal or factual basis on the record. That suffices for us to affirm, as we do, the district court's discretionary grant of a new trial.
 
 
 52
 REVERSED IN PART; AFFIRMED IN PART; AND REMANDED FOR NEW TRIAL.
 
 
 
 [1]
 Carolyn Bogey, an accountant for WSP, was also a trustee for the pension plan, but she apparently had no part in the decision to terminate the plan
 
 
 [2]
 The transactions the government alleged should have been listed on the SOFA forms were: 1) the sale of the "Barnes Farm" property by WSP to Ebern, Jr.; 2) the sale of property in Palm Beach, Florida previously purchased by WSP from Ebern, Sr.; 3) the redemption of stock WSP held in a separate corporation, the effect of which was to give complete control of that corporation to Ebern, Jr.; 4) the transfer of stock in another outside corporation from Ebern, Sr. to WSP and the subsequent sale of that stock by WSP; 5) two accounting transfers on WSP's books which had the effect of reducing Ebern, Jr.'s liability to the corporation, and hence to its creditors; 6) an $89,563.24 receivable owed by Ebern, Jr. to WSP
 
 
 [3]
 Wolff had made an oral motion for judgment of acquittal at the close of the government's case
 
 
 [4]
 Wolff had timely objected to the first sentence in the instruction, but not the more critical second sentence
 
 
 [5]
 Wolff's principal factual theories of defense at trial, at least as represented to us at oral argument, were that he did not know that the pension trust residual was not scheduled in the SOFA and believed that it was scheduled if it should have been, and that ambiguity in the status of the trust fund residual at the time of the SOFA filings precludes a finding of criminal intent. Cf. United States v. Collins, 424 F.Supp. 465, 467-68 (E.D.Ky.1977) (no fraudulent concealment where legal status of claim for back pay as "property" in bankruptcy filings was uncertain). These obviously are arguable defenses on the evidence, but their acceptance by the jury--which in fact rejected them--surely is not legally compelled
 
 
 [6]
 The district court's specific reliance on two courts of appeals' decisions affirming bankruptcy referees' findings of no concealment where questioned transactions were revealed at first creditors' meetings, see Thompson v. Eck, 149 F.2d 631, 633-34 (2d Cir.1945); In re Doody, 92 F.2d 653, 655 (7th Cir.1937), is misplaced. In those cases the courts were reviewing fact-findings under a clearly erroneous standard; here, review is to assess the minimal sufficiency of evidence to support jury verdicts
 
 
 [7]
 A power that was effectively absolute, because unreviewable, until a 1984 amendment to 18 U.S.C. § 3731 made possible government appeals from post-verdict grants of new trials. See Act of October 12, 1984, Pub.L. 98-473, Title II, § 1206, 98 Stat. 2153; 18 U.S.C. § 3731; Fed.R.Crim.P. 29(d); 3 C. Wright, § 559, at 79 n. 20 (1989 Pocket Part). Nothing in that jurisdictional change suggested, however, that, though now reviewable, the range of discretion directly conferred on district courts by Rule 33 in continuation of the common law tradition was to be reduced
 
 
 [8]
 The government challenges the propriety of the district court's reliance on this testimony as a basis for granting a new trial, there having been no proper objection at trial to its admission. Without getting into the question whether as a technical matter district courts in ruling on post-verdict motions are constrained by Fed.R.Crim.P. 52(b), as are appellate courts in reviewing for error, to take notice only of "plain error" in the absence of proper contemporaneous objection, and whether, if so, this error was "plain," we believe that in ruling on a new trial motion, a district court's discretion must certainly include the power to note error sua sponte