**COLONIAL DODGE, INC., et al.**

v.

**CHRYSLER CORPORATION.**

No. Civ.A. CCB–95–562.

United States District Court,
D. Maryland.

Dec. 2, 1996.

Walter E. Forehand, Myers, Forehand & Fuller, Tallahassee, Florida, for Plaintiffs.

Robert Donald Cultice, Goldstein & Manello, Boston, Massachusetts, for Defendant.

## MEMORANDUM

BLAKE, District Judge.

In February 1995, Colonial Dodge, Inc. ("Colonial"), Lakeforest Chrysler Plymouth ("Lakeforest"), Wheaton Dodge City, Inc. ("Wheaton"), and Fitzgerald Auto Mall, Inc. ("Fitzgerald Dodge") (collectively, "Dealers"), filed a seven count complaint against Chrysler Corporation ("Chrysler") in this court. The plaintiffs alleged violations of the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.* ("ADDCA"), § 15–207 of the Maryland Transportation Code ("State Act"), § 15–208 of the Maryland Transportation Code, as well as tortious interference with contract, tortious interference with business relations, breach of contract, and breach of the covenant of good faith by violation of Maryland Commercial Law I Code §§ 1–203 & 2–103(1)(b). In a supplemental complaint filed on July 17, 1995, the plaintiffs based their prayer for damages on four allegations: that Chrysler coerced the plaintiffs into accepting hard-to-sell automobiles as a precondition to receiving excess fast-selling automobiles; that Chrysler coerced Lakeforest into constructing a new showroom; that Chrysler attempted to coerce and intimidate the plaintiffs into dropping their opposition to Chrysler's plan to place a Dodge franchise in Germantown, Maryland; and that Chrysler acted in a coercive manner by subjecting Lakeforest to unreasonable conditions in the receipt of warranty payments.

Now pending are two summary judgment motions filed by Chrysler.[1] Chrysler argues in its first motion that the plaintiffs' inability to prove coercion renders invalid counts one and two under the ADDCA and the State Act. Chrysler then argues in its second motion that summary judgment should be granted on all counts because the plaintiffs cannot prove they ever ordered the specific vehicles they now claim were wrongfully withheld, a necessary element of malallocation. A hearing was held on September 9, 1996, following which this Court reserved judgment. By separate Order this Court will grant both motions and enter summary judgment on all counts.

## BACKGROUND

Dealers sell, lease, and service motor vehicles manufactured by the defendant, Chrysler Corporation. (John J. Fitzgerald Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit C ¶ 6.) The plaintiffs are owned and controlled by a holding company, JJF Management Services, Inc. ("JJF"), whose principal owner is John J. Fitzgerald. (*Id.* ¶¶ 3,4.) It is undisputed that each plaintiff is an "automobile dealer" as defined by 15 U.S.C. § 1221(c) (1982), and the defendant is an "automobile manufacturer" as defined by 15 U.S.C. § 1221(a) (1982). It is also undisputed that each plaintiff is a party to a written dealer agreement ("Dealer Agreement") with Chrysler within the meaning of the ADDCA and the Maryland Dealers' Act. Pursuant to these agreements, Chrysler agreed to provide and Dealers agreed to offer for sale certain vehicles pursuant to Chrysler's allocation system.

James W. Cash, Vice President of JJF, and Eyal Toueg, Lakeforest General Sales Manager, provide the basis for the plaintiffs' malallocation claim. Mr. Cash states in an affidavit that during the period 1986 to 1994,

---

1. Also pending are two motions to strike by Chrysler. This Court need not rule on these motions to decide the summary judgment motions. For the purposes of this Memorandum Opinion, all statements contained in the affidavits at issue will be considered admissible.

consumers' demand for Dodge Caravans often out paced the plaintiffs' supply. (James W. Cash Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit A ¶¶ 9, 10.) During such periods of high demand, Mr. Cash and Ms. Toueg often approached the Chrysler District Manager for Caravans in addition to those already due to and received by the plaintiffs under Chrysler's allocation system. (Cash Aff. ¶ 10; Toueg Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit B ¶ 7.) Chrysler District Managers rejected these requests, explaining that "Caravan allocations were based solely on the 'turn and earn' method—the more a dealership sells, the more a dealership gets." (Cash Aff. ¶ 11; *see also* Toueg Aff. ¶ 8.) Chrysler, in other words, was unwilling to provide Caravans outside of its predetermined allocation formula. According to both Mr. Cash and Ms. Toueg, however, Chrysler District Managers repeatedly offered to provide additional Caravans if the plaintiffs would also accept additional hard-to-sell models. (Cash Aff. ¶ 12; Toueg Aff. ¶ 8.) Mr. Cash and Ms. Toueg "[o]n many occasions . . . agreed to cooperate . . . and accepted the undesirable models in order to get additional Caravans." (Cash Aff. ¶ 13; *see* Toueg Aff. ¶ 10.) Had he not acceded to these requests, Mr. Cash asserts that Caravan availability would have further eroded due to his inability to "turn and earn" more Caravans. (Cash Aff. ¶¶ 13, 14.) This would have led to lower profits and a potential loss of salespeople to more profitable enterprises. (*Id.*)

In 1990, Lakeforest initiated a plan to construct a new facility for its Chrysler dealership. Since 1978, the Lakeforest facility on Route 355 had housed Fitzgerald's Lakeforest Chrysler Plymouth, Inc. and Fitzgerald's Lakeforest Oldsmobile, Inc. Sometime prior to 1990, Mr. Fitzgerald and JJF made plans to add a Toyota dealership to the Lakeforest facility. The defendant objected to this plan because of its unwillingness to share a showroom with another make of automobile.

Mr. Fitzgerald, the President of JJF, provides the plaintiffs' sole evidence of coercion regarding construction of the Lakeforest additional facility. Mr. Fitzgerald states in an affidavit that he received a telephone call from Dave Winton, Vice President of Chrysler Credit in early 1990. (Fitzgerald Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit C

¶ 8.) Mr. Winton allegedly related that Van Gray, the Chrysler Zone Manager, "appeared determined" to terminate Chrysler's sales and service agreements with Lakeforest because of "dualing." (*Id.* ¶ 9.) Mr. Winton allegedly stated that Mr. Fitzgerald "should be extremely careful with how [Fitzgerald] was adding the Toyota franchise in Gaithersburg." (*Id.*) After this conversation, Mr. Fitzgerald and Mr. Jenkins, Executive Vice President of JJF, decided that to avoid termination they should build a new Chrysler showroom on Russell Avenue. (Fitzgerald Aff., Pl's Opp'n to Absence of Coercion, Exhibit C ¶ 10; Jenkins Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit D ¶ 10.) Prior to the conversation with Mr. Winton, Mr. Fitzgerald and Mr. Jenkins contend that they had never considered spending any money to construct an additional showroom to sell Chrysler automobiles. (Fitzgerald Aff. ¶ 10; Jenkins Aff. ¶ 10.) Mr. Fitzgerald maintains that he built the Russell Avenue facility out of fear of being terminated by Chrysler. (Fitzgerald Aff. ¶ 11.)

Chrysler counters that it in fact opposed the construction of Lakeforest's new facility. In contrast with his affidavit, Mr. Fitzgerald's deposition testimony corroborates Chrysler's version at length. (*See, e.g.,* Fitzgerald Dep., Def.'s Motion for Summary Judgment as to Absence of Orders, Exhibits E, F at 149–50, 206, 318–19, 428–30.) Eventually, in February 1991, Chrysler approved the plaintiffs' plan to operate a Toyota dealership on the Lakeforest facility after Lakeforest promised to build a new separate showroom for Lakeforest's Chrysler–Plymouth. The construction of the new showroom cost more than one and a half million dollars and has not been a successful investment for Mr. Fitzgerald. (Fitzgerald Dep., Def.'s Motion for Summary Judgment as to Absence of Orders, Exhibit E at 141; Fitzgerald Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit C ¶ 11.)

Beginning in or around 1990, Chrysler indicated its desire to place a new Dodge dealership in Germantown, Maryland, with an approximate volume of 350 vehicles. This proposed new dealership was to be located approximately three to four miles north of

Fitzgerald's Lakeforest Chrysler Plymouth and in the vicinity of Fitzgerald Dodge. The plaintiffs, Mr. Fitzgerald and JJF, expressed their opposition to the defendant's plan. In late 1992, Chrysler decided to put aside the plan and re-examine it in two years.

Chrysler's vehicle allocation system provided vehicles to dealerships through three avenues: an initial allocation, a reallocation of unordered vehicles left over from dealerships' initial allocations, and distribution of a "reserve" maintained by a regional Zone manager. The allocation and reallocation were based upon a mathematical algorithm which allotted a certain number of vehicles to each dealership based on the dealership's sales and inventory levels, as well as the number of vehicles then in transit to dealers. (William C. Potter Dep., Pl.'s Opp'n to Absence of Orders, Exhibit D at 23–25.) No allegations have been made that Chrysler's allocation algorithm inherently malallocates vehicles.

In June 1993, Chrysler converted from a monthly allocation system to a weekly allocation system. Plaintiffs' counsel stated at oral argument that since the modification of Chrysler's allocation system, Dealers have suffered no further malallocation of vehicles.

The initial allocation was specific only as to the quantity and model of the vehicles (e.g., ten Dodge Caravans), not as to any specific equipment (e.g., engine size, optional equipment). (*See Id.* at 34–35.) The dealership then had a certain period of time within which to order specific vehicles consistent with its allocation. (*Id.* at 25.) The dealership was responsible for ordering "buildable" vehicles, that is, for ordering only vehicles with equipment that could be placed on a given model at a given time. (*Id.* at 34–35.) Dealerships' orders, however, did not always coincide with Chrysler's allocation. Dealerships "frequently," for instance, ordered vehicles that were then unbuildable. (*Id.* at 35–36.) If the specific vehicles ordered by the dealership were unbuildable, the order would go unfilled. (*Id.*) Chrysler's Zone Manager stated that "[w]e would certainly bring it to their attention," if a dealership

was ordering unbuildable vehicles. (*Id.* at 36.) Such notice was never received by Dealers. (Cash Aff., Pl.'s Opp'n to Absence of Orders, Exhibit B ¶ 12.).

Similarly, dealerships were allowed to order vehicles in excess of their allocation, but they were not guaranteed delivery of these excess vehicles. (*See* Potter Dep., Pl.'s Opp'n to Absence of Orders, Exhibit D at 28–29.) If a dealership chose not to order its full allocation, the unordered vehicles were reallocated by the national computer system to dealerships within the Zone that had pending orders in excess of their allocation. (*Id.* at 54–55.) In this way, some of the excess orders were filled.

In addition, the regional Chrysler/Dodge/Plymouth Zone office had a right to reserve up to 10% of the entire Zone's allocation, for discretionary allocation by the Zone Manager. (*Id.* at 55–56, 63.) No set formula guided the distribution of these vehicles. (*Id.* at 63.) The Chrysler Zone Manager, however, testified that he was "pretty open with the dealers" about the distribution policy. (*Id.* at 56.) The "absolute majority" of these vehicles, he testified, went toward supplying dealerships with vehicles to satisfy "sold orders," vehicles on order that had already been sold to specific customers. (*Id.* at 63.) The Zone Manager stated that after satisfying sold orders there was "generally, not very much ever left." (*Id.* at 56.)

The plaintiffs have not entered paper orders since 1986. (Cash Aff., Pl.'s Opp'n to Absence of Orders, Exhibit B ¶ 11; Potter Dep., Pl.'s Opp'n to Absence of Orders, Exhibit D at 36–37.) All dealership orders are entered into computers at the dealership and processed by networked computers through the Dealer Information Access Link (DIAL).[2] (Potter Dep., Pl.'s Opp'n to Absence of Orders, Exhibit D at 37.) The order information travels over the telephone lines from the dealership to Chrysler's mainframe computer in Detroit, where it is received as an order. (*Id.* at 36–39.) Although paper printouts can be generated from the DIAL system, paper

---

**2.** Until 1993, the dealerships apparently filled out order forms manually, from which they typed the information into the DIAL system. (Potter Dep. at 37–38.) These order forms never left the

dealerships, and seem to have served only as templates for the orders entered into the DIAL system. (*Id.*) None have been submitted by Dealers, and there is no indication that any still exist.

records were not saved as a matter of course, either by Chrysler or by Dealers. (*Id.* at 50–53; *see also* Cash Aff., Pl.'s Opp'n to Absence of Orders, Exhibit B ¶ 11.)

The Dealers' experts reach a number of conclusions in their joint affidavit. They begin by noting that Dodge Caravans and Grand Caravans, the two most popular Dodge models, were in short supply during most of the relevant time period. (Joint Aff. of Dr. Lyman E. Ostlund and Dr. Ernest H. Manuel, Jr., Pl.'s Opp'n to Absence of Orders, Exhibit C ¶ 7.) Under such conditions, a dealership's sales depend more on the supply available than on the dealer's sales abilities. (*Id.* ¶ 8.) In contrast, sales of less-desirable models depend more heavily on the dealer's abilities. (*Id.*) Therefore, the experts conclude, within the same competitive market one would expect to find competing dealers to have a comparable "mix" of in-demand and less-desirable models. (*Id.*) The experts then attempted to apply this framework to the facts in the present case.

Chrysler produced to Dealers database information indicating the following for each Washington Zone dealership: the number of vehicle models ordered by each dealership, Chrysler's allocation, any modifications to this allocation, the number of vehicles shipped, and the sales of each dealership. (*Id.* ¶ 5.) Dealers' counsel acknowledged at oral argument that the data specify only the vehicle chassis type, referred to here as the vehicle "model." (Transcript of Hearing September 4, 1996 at 26–27.) Dealers' counsel further confirmed that they do not have and cannot obtain more detailed records concerning the specific vehicles ordered. (*Id.* at 26–28.)

According to Dealers' experts, the data indicate that several competing Dodge dealerships received a higher percentage of Caravans as compared to other vehicles than did the plaintiff Dodge dealers. (*Id.* ¶ 9.) The experts do not discuss the similarity of the dealerships used for comparison. The plaintiffs' experts seem to have first, calculated the number of Caravans and Intrepids Dealers received as a percentage of the total vehicles Dealers received, then, compared these percentages with similarly calculated percentages from two or three different dealerships within the Zone. (*See id.* ¶ 9.) Deal-

ers' percentage receipt of Caravans comprised anywhere from 38.2% (1993) to 92.2% (1991) of the percentage received by Herb Gordon Dodge. (*Id.*) Dealer's percentage receipt of Caravans comprised anywhere from 29.9% (1993) to 69.9% (1988) of the percentage received by Fair Oaks Dodge.

Dealers' experts state that Koons Dodge presented an example of what the market demand actually was for Caravans. (*Id.* ¶ 10.) In 1993, 51.3% of Koons' vehicles received were Caravans, while 31.3% of Dealers' vehicles received were Caravans. (*Id.*) Koons, however, presented an exceptional case—1993 marked the opening of its Dodge dealership, and so its allocation was treated differently from existing dealerships. (Potter Dep., Pl.'s Opp'n to Absence of Orders, Exhibit D at 78–79, 125–29). Koons was allowed to order what it considered an optimal mix of vehicles. (*Id.* at 128.)

Dealers' experts' also evaluated differences in deliveries of Intrepids. (Joint Aff., Pl.'s Opp'n to Absence of Orders, Exhibit C ¶ 15.) The most desirable Intrepid was the ES version, with the 3.5 liter engine. (*Id.*) Herb Gordon received 36.2% of its shipments in Intrepids, compared with 29% for Dealers. (*Id.*) Of the Intrepids Herb Gordon received, 61.7% were the ES model, compared with 53.2% for Dealers. (*Id.*) "Better than 45%" of Herb Gordon's Intrepids were outfitted with the 3.5 liter engine, while "less than 27%" of Dealers' Intrepids came with the 3.5 liter engine. (*Id.*) No explanation is provided as to the time period of these comparisons, or as to the suitability of the dealerships used for comparison.

Dealers' experts also stress that other dealerships received vehicles in excess of their orders more frequently than did the plaintiffs. In 1991, the Dealers received vehicles in excess of their orders twice. Monthly receipts during 1991 exceeded orders nine times for Herb Gordon Dodge and ten times for Fair Oaks Dodge. (*Id.* ¶ 11.) In 1992, Dealers' vehicle receipts exceeded orders only twice, compared to more than seven times each at both Herb Gordon Dodge and Fair Oaks Dodge. (*Id.*)

## ANALYSIS

An automobile dealer may bring suit under the ADDCA when the automobile manufacturer fails "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise."[3] 15 U.S.C. § 1222 (1982). "Good faith" is defined as "the duty . . . to act in a fair and equitable manner . . . so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C. § 1221(e) (1996).

 Good faith under the ADDCA has been construed to mean more than mere unfairness, and "must be determined in the context of actual or threatened coercion or intimidation." *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52, 55–56 (4th Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *see also Gage v. General Motors Corp.,* 796 F.2d 345, 351 (10th Cir.1986); *Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049, 1056 (1st Cir.1985); *Autohaus Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d 901, 911 (9th Cir.1978), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978). Only if a manufacturer's conduct amounts to actual or threatened coercion or intimidation does a manufacturer fail to act in good faith for purposes of the ADDCA. *Eastern Auto Distribs., Inc. v. Peugeot Motors of America, Inc.,* 795 F.2d 329, 336 (4th Cir.1986); *Minson Plymouth, Inc. v. Chrysler Motors Corp.,* 554 F.2d 1266, 1267 (4th Cir.1977); *R.D. Imports Ryno Indus., Inc. v. Mazda Distributors (Gulf), Inc.,* 807 F.2d 1222, 1227 (5th Cir.), *cert. denied,* 484 U.S. 818, 108 S.Ct. 75, 98 L.Ed.2d 38 (1987). Mere "discriminatory allocation, without the concomitant of coercion, does not constitute conduct proscribed by the Act." *Ed Houser Enters. v. General Motors Corp.,* 595 F.2d 366, 371 (7th Cir. 1978). The existence of coercion or intimidation may be inferred from a course of conduct. *David R. McGeorge,* 504 F.2d at 56 n. 7 (quoting H.Rep. No. 2850, 84th cong., 2d Sess. 9, at 4596, 4603 (1956)). The focus of the inquiry must be on the defendant's conduct, however, not on the dealer's perception of coercion or intimidation. *Wallace,* 780 F.2d at 1056; *see also Francis Chevrolet Co. v. General Motors Corp.,* 602 F.2d 227, 229 (8th Cir.1979) (holding that the plaintiff's feeling "compelled" is not sufficient to establish an ADDCA violation).

Every circuit court of appeals that has addressed the issue has held that coercion or intimidation must include a wrongful demand accompanied by the threat of sanctions for noncompliance. *See Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 796 (7th Cir.1989) (citing *Ed Houser Enters.,* 595 F.2d at 369); *Dreiling v. Peugeot Motors of America, Inc.,* 850 F.2d 1373, 1379 (10th Cir.1988); *Empire Volkswagen Inc. v. World–Wide Volkswagen Corp.,* 814 F.2d 90, 95–97 (2d Cir.1987); *R.D. Imports,* 807 F.2d at 1227 (5th Cir.1987); *Wallace,* 780 F.2d at 1056 (1st Cir.1985); *American Motors Sales Corp. v. Runke,* 708 F.2d 202, 207 (6th Cir. 1983); *Francis Chevrolet,* 602 F.2d at 229 (8th Cir.1979); *Autohaus,* 567 F.2d at 911 (9th Cir.1978); *Rea v. Ford Motor Co.,* 497 F.2d 577, 585 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). Both Fourth Circuit cases addressing the ADDCA involve a wrongful demand. *Southern Pines Chrysler–Plymouth, Inc. v. Chrysler Corp.,* 826 F.2d 1360 (4th Cir.1987); *David R. McGeorge,* 504 F.2d 52; *see also Frank Meador Buick, Inc. v. General Motors Acceptance Corp.,* 13 B.R. 841, 844–45 (Bkrtcy.W.D.Va.1981). The wrongful demand requirement will be applied in the present case.

3. The text of 15 U.S.C. § 1222 provides in full: An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

The State Act prohibiting coercion of dealers generally mirrors the ADDCA, although it provides more specific standards for coercion. The Maryland Transportation Code § 15–207 states:

(a) *"Coerce" defined.*—In this section:

(1) "Coerce" means to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences: and

(2) "Coerce" does not mean to argue, urge, recommend, or persuade.

(b) *In general.*—A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, or representative, may not coerce any dealer to make any agreement with the manufacturer, distributor, or factory branch.

(c) Delivery of vehicles, equipment, etc.—A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, or representative, may not coerce any dealer to order or accept delivery of any vehicle, any equipment, parts, or accessories for a vehicle, or any other commodity that is not required by law or by the dealer's franchise or that was not ordered voluntarily by the dealer.

Md.Code Ann., Transp. § 15–207.

■ The parties apply the same analysis to the State Act and the ADDCA claims. While there are slight differences between the state and federal statutes, "coercion" under both the State Act and the ADDCA embodies the same concept, and accordingly the same analysis applies. *See Cemar, Inc. v. Nissan Motor Corp. in U.S.A.,* 713 F.Supp. 725, 730 (D.Del.1989) (applying same analysis to ADDCA and State Act claims).

## A. ABSENCE OF COERCION

Chrysler moves for summary judgment on Plaintiffs' claims in Count One under the ADDCA and Count Two under the State Act. Chrysler argues that Dealers failed to present adequate evidence of coercion, a necessary element of each statute. Dealers maintain that their evidence raises a material question of fact about Chrysler's good faith in its dealings. Specifically, Dealers argue

that Chrysler malallocated vehicles, coerced Lakeforest to build a new showroom, and attempted to intimidate and coerce Dealers to abandon their opposition to a new franchise in Germantown, Maryland. Dealers' offered evidence of coercion is insufficient.[4]

■ A manufacturer's duty toward a dealer is defined initially by its allocation agreement. A dealer is entitled only to the cars due under the allocation system, not to all the automobiles it requests. *See Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.,* 773 F.2d 1193, 1202–04 (11th Cir. 1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986); *see Bob Maxfield Inc. v. American Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981) (finding no coercion where there was no evidence that the defendant never *required* the plaintiff to choose between accepting large automobiles and facing a cutoff of small automobiles); *Southern Rambler Sales, Inc. v. American Motors Corp.,* 375 F.2d 932, 935 (5th Cir.), *cert. denied,* 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967) (finding that because ADDCA does not afford the dealer a statutory right or formula for allocation or delivery of certain automobiles, "[plaintiff] must demonstrate that degree of bad faith allocation which has coercive and intimidating effects"); *Autohaus,* 567 F.2d at 914 (explaining that even if the dealer's order for new automobiles was bona fide and the manufacturer refused to deliver automobiles it had in stock, no lack of good faith exists without evidence that the manufacturer tried to coerce or intimidate the plaintiff by withholding the automobiles).

■ Manufacturers are granted significant leeway in suggesting how a dealer can obtain automobiles in addition to those due under the allocation agreement. In *Cabriolet Porsche Audi,* for instance, Honda gave Cabriolet its full allocation of automobiles, but conditioned any further vehicles on Cabriolet's construction of an exclusive Honda facility. 773 F.2d at 1210. The Eleventh Circuit held that as a matter of law Honda's conduct

---

**4.** Dealers also made a warranty claim. Because they have presented no evidence regarding this claim it will be considered abandoned.

did not constitute coercion. *Id.* Honda, the court emphasized, did not threaten to withhold, and did not withhold, any automobiles to which Cabriolet was entitled under Honda's allocation system. *Id.* Rather, Honda's actions constituted suggestions as to how Cabriolet could obtain more automobiles than it was entitled to receive under Honda's allocation system. Such conduct amounted to "nothing more than 'recommendation, endorsement, exposition, persuasion, urging,'" which does not constitute a lack of good faith under the ADDCA. *Id.* at 1211 (citations omitted). The court noted that "Honda's suggestion did not present a 'condition[ ] which benefit[ed] only, or primarily, the manufacturer,' as is typically the case in cases of 'coercion.'" *Id.* at 1210 (quoting *Volkswagen Interamericana v. Rohlsen,* 360 F.2d 437, 442 (1st Cir.), *cert. denied,* 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966)); *see R.D. Imports,* 807 F.2d at 1227 (finding no coercion where manufacturer suggested way for dealer to obtain excess cars in addition to its normal allocation).

### 1. Alleged Malallocation to Dealers

The plaintiffs rely primarily on two cases, *David R. McGeorge,* 504 F.2d 52, and *Southern Pines,* 826 F.2d 1360, to support their malallocation theory. McGeorge Car Company, a dealership which sold automobiles from Mercedes–Benz, Triumph, and Toyota throughout the 1960s, brought suit against British Leyland for violation of the ADDCA. 504 F.2d at 53–54. In 1967, British Leyland gained control of both Triumph and Rover, two British automobile makers. *Id.* at 54. Shortly thereafter, British Leyland proposed that dealers throughout the United States begin to sell Rovers as well as Triumphs. *Id.* When McGeorge declined this proposal based on its assessment that the Rover had little sales potential and would compete with the Mercedes–Benz line, Leyland retaliated. It cut McGeorge's supply of Triumphs by 50% in 1969 and an additional 16% in 1970. *Id.* Other Virginia dealers saw cutbacks of 25% in 1969 (due to a supply shortage, the nationwide supply of Triumphs was down 10—20%) and increases of up to 93% in 1970.

In September 1970, Leyland refused to renew its dealership agreement with McGeorge. *Id.* On these facts, the Fourth Circuit upheld the District Court's finding of coercion, and the corresponding liability on the ADDCA claim, concerning the malallocation of automobiles. *Id.* at 55.[5]

In *Southern Pines,* Chrysler and the dealer entered into a "full-line agreement" whereby Chrysler agreed to provide and Southern Pines agreed to buy a complete selection of Chrysler automobiles. 826 F.2d at 1362. At some point Chrysler attempted to force Southern Pines to engage in "tie-in sales," in contravention to the full-line agreement. Chrysler's sales manager either stated or implied that in order to acquire the faster-selling automobiles ("tied automobiles"), the dealership would have to buy hard-to-sell automobiles ("tying automobiles") in excess of the full-line contract. *Id.* This "tie-in sale" forced Southern Pines to fill its showroom with automobiles it could not sell, and to use up its line of credit so that it could not buy automobiles from other manufacturers. *Id.* The jury returned a verdict in favor of the plaintiff on the ADDCA claim, and the Fourth Circuit affirmed. *Id.* at 1361.

Both *David R. McGeorge* and *Southern Pines* are distinguishable from the present case. In *Southern Pines* and *David R. McGeorge,* the manufacturer failed to abide by its allocation agreement. *Southern Pines,* 826 F.2d at 1362; *David R. McGeorge,* 504 F.2d at 55–56. In *David R. McGeorge,* the plaintiff's evidence indicated that British Leyland refused to supply it with the automobiles due under the allocation agreement, or to supply it with a reasonable allotment during time of supply shortage. 504 F.2d at 55–56. British Leyland made a clear wrongful demand—that McGeorge sell Rovers or be terminated as a Triumph dealer. This threat was backed up by the sanction of decreased supplies of Triumphs. *See id.* In *Southern Pines,* the manufacturer forced the dealer to purchase unwanted, hard-to-sell automobiles in excess of the full-line contract requirement. 826 F.2d at 1362. As in *David*

---

**5.** The Fourth Circuit read into the dealership agreement an implied provision that in the event of a supply shortage the manufacturer would treat its dealers equitably. *David R. McGeorge,* 504 F.2d at 56.

*R. McGeorge,* this threat was supported by the manufacturer's refusal to supply the automobiles due under the allocation agreement. *Id.* at 1362–63.

■ In the present case, viewing the evidence in the light most favorable to the plaintiffs, Dealers fail to provide any evidence that they were confronted with a wrongful demand accompanied by a threat of sanctions for noncompliance. The plaintiffs neither claim that they were faced with an "either/or" choice as in *David R. McGeorge* nor that they were required to purchase a specified number or type of vehicle beyond the specified terms of the Dealer Agreement. The affidavits of James William Cash and Eyal Toueg merely indicate that Chrysler refused to supply high-demand vehicles beyond what was allocated under the "turn and earn" method unless the plaintiffs agreed to order additional low-demand models. (*See* Cash Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit A ¶ 12; Toueg Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit B ¶ 8.) The plaintiffs offer no evidence that the defendant was required under any existing agreement to provide these vehicles. Moreover, the plaintiffs provide no evidence that the defendant threatened to cut back on their supply of other automobiles if they decided not to order additional automobiles beyond the "turn and earn" system. In short, the plaintiffs cannot demonstrate coercion within the meaning of the statute.[6] Accordingly, the plaintiffs have failed to establish any genuine dispute of material fact that would preclude summary judgment on their malallocation claim.

### 2. *Construction of Lakeforest Showroom*

■ The plaintiffs claim that the defendants coerced Lakeforest to expend considerable sums on construction of and capital improvements to a new showroom. The sole evidence of coercion offered by the plaintiffs is information, allegedly related by Mr. Winton, that Van Gray, the Chrysler Zone Manager, "appeared determined" to terminate Chrysler's sales and service agreements with Lakeforest because of dualing. (Fitzgerald

Aff., Pl.'s Opp'n to Absence of Coercion, Exhibit C ¶ 9.) Mr. Winton allegedly stated that Mr. Fitzgerald "should be extremely careful with how [Fitzgerald] was adding the Toyota franchise in Gaithersburg." (*Id.*)

Chrysler never made any explicit demands regarding the new showroom. To the contrary, Chrysler vehemently and repeatedly opposed the addition of the Toyota line. In response to this opposition, Mr. Fitzgerald "decided to offer whatever it would take to get [Chrysler] to approve [the move to the new showroom]." (Fitzgerald Dep., Def.'s Mot. for Summary Judgment as to Absence of Orders, Exhibit E at 206.) Mr. Fitzgerald's deposition is instructive concerning the genesis of the idea to construct the new facility:

A. Well, I decided to offer whatever it would take to get them to get [Chrysler] to approve [the new facility].

Q. Did they tell you that's what they wanted?

A. No. They told me they did not want Toyota on the site. And of course, that's a—that would be a financial disaster.

 . . . . .

Q. You are not claiming, Mr.—that anybody at Chrysler said to you build 11,000 square feet of additional space? That claim you are not making, correct?

A. No. No one ever told me at Chrysler what to do. That's my problem. I could never get them to commit to anything until I got up to where I had this mammoth facility. . . . I just couldn't afford it and it was a bad business decision but I did it. They okayed that finally.

(*Id.* at 206, 149–50.)

Lacking evidence of a direct demand, the plaintiffs argue that the court should "infer from the evidence that the threat to terminate . . . was coercive and the natural product it produced was the unwanted building."

---

**6.** This conclusion is strengthened by Dealers' counsel's statements at oral argument that Dealers suffered no further harm after Chrysler modified its operations to allocate vehicles on a weekly basis and that Dealers may have suffered no harm at any time distinct from other dealerships within the Zone. (Transcript of Hearing on September 4, 1996 at 24, 33.)

(Pl.'s Opp'n to Absence of Coercion at 13.) This inference is belied by Mr. Fitzgerald's numerous statements that he had intended since 1976 to move the Chrysler showrooms to Russell Avenue, and that he spent considerable energies trying to convince Chrysler to accept the proposal for the Russell Avenue showroom. (Letter from Fitzgerald to Van W. Gray of 5/16/90, Def.'s Mot. for Summary Judgment as to Absence of Orders, Exhibit J); letter from Fitzgerald to William C. Glaub of 5/18/90, Def.'s Mot. for Summary Judgment as to Absence of Orders, Exhibit K; letter from Fitzgerald to E.T. Pappert of 12/28/90, Def.'s Mot. for Summary Judgment as to Absence of Orders, Exhibit M; letter from Fitzgerald to Gray of 1/3/91, Def.'s Mot. for Summary Judgment as to Absence of Orders, Exhibit N ¶ 4 ("the long term plan of all concerned was to have the GM and Chrysler showrooms on Russell Avenue"); letter from Fitzgerald to Pappert of 1/14/91, Def.'s Mot. for Summary Judgment as to Absence of Orders, Exhibit O ¶ 7 ("If [the Russell Avenue showroom] is not a win, win plan, *please* show me why before I invest my million and a half...." (emphasis in original)).

The evidence does not support the conclusion that Chrysler demanded the new showroom. Chrysler vigorously opposed this proposed move for some time. (Fitzgerald Dep., Def.'s Mot. for Summary Judgment as to Absence of Orders, Exhibit E at 165–66 (indicating that Chrysler was not going to permit relocation of the showroom to Russell Avenue)); letter from Gray to Fitzgerald of 12/21/90, Def.'s Mot. for Summary Judgment as to the Absence of Orders, Exhibit L ¶ 4 ("I am advising you of [Chrysler's disapproval of the relocation] so that you will be fully aware of our intent [to terminate the dealership agreement upon any relocation] prior to any construction on your part."); letter from Pappert to Fitzgerald of 2/6/91, Def.'s Mot. for Summary Judgment as to Absence of Orders, Exhibit P ¶ 1 ("We've reviewed your request to move your Chrysler–Plymouth store from the Route 355 location to a spot on Russell Street. After much consideration and review, I must inform you that Chrysler cannot condone such a move.") Chrysler's repeated opposition to the proposed relocation indicates that it did not coerce such an action, but only acceded to it after significant efforts by Mr. Fitzgerald. Lakeforest provides no evidence that Chrysler's opposition was disingenuous or that Chrysler in any way sought a relocation. To the contrary, Chrysler repeatedly indicated its desire to stay where it had always been located.

If the plaintiffs' own uncoerced actions caused the manufacturer's reprisal, summary judgment for the manufacturer is warranted. *See Salco Corp. v. General Motors Corp., Buick Motor Division,* 517 F.2d 567 (10th Cir.1975). In *Salco,* the dealer chose to sell his existing lot and relocate to another lot and continue the dealership. General Motors refused to continue the dealership agreement. *Id.* at 570. Although the dealer argued that the manufacturer made the termination inevitable by refusing to grant a dealership on the new location, the court found that the dealer itself made the termination inevitable by selling its property and discontinuing a dealership at that location. *Id.* at 571.

In the present case, the plaintiffs chose to introduce another business in the location of the defendant's original showroom. There is no evidentiary basis to infer that the defendant acted in a coercive manner when it reacted to the Plaintiff's plan to add another franchise.

■ Further, in order to establish a lack of good faith under ADDCA, a plaintiff must establish a "causal connection" between the dealer's resistance to the coercive conduct and the termination. *Wallace,* 780 F.2d at 1056; *Bob Maxfield,* 637 F.2d at 1038; *Ed Houser,* 595 F.2d at 371; *Kotula v. Ford Motor Co.,* 338 F.2d 732, 736 (8th Cir.1964), *cert. denied,* 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); *Autohaus,* 567 F.2d at 911. In *Kotula v. Ford Motor Co.,* the plaintiff argued that as a part of a plan designed to terminate the dealership, the manufacturer repeatedly pressured the plaintiff to purchase hard-to-sell trucks. 338 F.2d at 736. Because the evidence "wholly fail[ed] to establish any causal connection between the coercive conduct relied upon, and the termination of the agreement," the court affirmed the judgment for the manufacturer as a matter of law. *Id.* Similarly, the record in the

present case is devoid of any evidence that the defendant threatened to terminate the dealership in order to coerce the plaintiffs to build a new showroom. Rather, the evidence shows that Mr. Fitzgerald raised the idea and then obtained the defendant's approval to build the new showroom.

The plaintiffs' references to Mr. Fitzgerald's financial predicament as evidence of coercion are unavailing. The plaintiffs emphasize that:

> Mr. Fitzgerald was faced with a serious financial problem which he anticipated might be alleviated by adding the Toyota line make. Consequently, Lakeforest Chrysler–Plymouth was faced with serious financial consequences or mollifying Mr. Gray. It chose the latter by expending money to build a facility that it would not otherwise have built.

(Pl.'s Opp'n to Absence of Coercion at 13.) In *Cemar* the court refused to find bad faith where the plaintiff was "coerced" not by the defendant, but by his own economic circumstances. 713 F.Supp. at 730. Similarly, the plaintiff's assertion of Mr. Fitzgerald's financial problems is not enough to prove that the defendant acted in bad faith.

As a matter of law, Chrysler did not coerce Lakeforest into constructing the new showroom, which Mr. Fitzgerald suggested and Chrysler vigorously opposed over an extended period of time. For the above reasons, this Court finds that Chrysler's actions concerning the construction of the Lakeforest facility did not violate the ADDCA.

### 3. *Opposition to Proposed Germantown Dealership*

The plaintiffs also claim that the defendant systematically and intentionally malallocated vehicles to the plaintiffs in order to intimidate and to coerce the plaintiffs into dropping their opposition to Chrysler's plan to place an additional Dodge franchise in Germantown, Maryland. The plaintiffs assert that despite their lack of evidence,

"there is a connection that can be logically made between the shorting of vehicles which plaintiffs have alleged and for which they have supplied evidence, and Mr. Fitzgerald's opposition to the proposed dealership." (Pl.'s Opp'n to Absence of Coercion at 13.) Their argument is not persuasive.

The ADDCA does not preclude a manufacturer from appointing an additional dealer in a community "unless the appointment is used as an instrument of coercion or intimidation." *Garvin v. American Motor Sales Corp.*, 318 F.2d 518, 520 (3d Cir.1963) (citing H.Rep. No. 2850, 84th Cong., 2d Sess. (1956), 3 U.S.C.C.A.N. 4596, 4603 (1956) [7]; *see also Southern Rambler,* 375 F.2d at 936 (observing that ADDCA does not grant a dealer the right to an exclusive dealership in his territory); *Globe Motors, Inc. v. Studebaker–Packard Corp.,* 328 F.2d 645, 650 (3rd Cir.1964) (establishing a competitive dealership ten blocks away does not prove failure to act in good faith). In *Garvin,* the Third Circuit held that the record was completely devoid of any evidence that the dealership was established as a coercive device, although the plaintiff argued that the jury could infer bad faith from testimony indicating that the franchises were located in a one-dealer town. 318 F.2d at 520.

In the present case, the Dealer Agreements expressly specify that the plaintiffs have a non-exclusive right to sell within a certain area. The plaintiffs fail to offer any evidence of coercion or intimidation concerning Chrysler's plan to appoint another dealership. *See Victory Motors of Savannah, Inc. v. Chrysler Motors Corp.,* 357 F.2d 429, 432 (5th Cir.1966) (explaining that when the dealership agreement does not prevent the manufacturer from establishing a new dealer, the plaintiff must show that its "establishment was a threat of coercion or intimidation amounting to bad faith. . . .") Nor do the plaintiffs offer evidence that the defendant objected to Mr. Fitzgerald's opposition to the

---

**7.** The committee emphasized that the bill does not afford the dealer the right to be free from competition from additional franchise dealers. H.Rep. No. 2850, 84th Cong., 2d Sess. (1956), 3 U.S.Code Cong. & Adm.News, pp. 4596, 4603–4604 (1956). Appointment of added dealers in an area is a normal competitive method for securing better distribution, and curtailment of this right would be inconsistent with the antitrust objectives of this legislation. *Id.* Under the bill, a manufacturer does not guarantee the dealer a profitable operation or freedom from depletion of investment. *Id.*

proposed dealership. In fact, the defendant agreed to put the plan aside and re-examine it two years later. As of yet, Chrysler has not built the new dealership. (Def.'s Mot. for Summary Judgment as to Absence of Coercion at 18.)

In *Overseas Motors, Inc. v. Import Motors Ltd.*, the plaintiff argued that the defendant "pinched off" deliveries of certain automobiles to induce an early termination of an agreement. 519 F.2d 119, 124 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975). However, the court found no coercion because either party was allowed to terminate the agreement with notice and there was no evidence to suggest any reason the defendant would have wanted or needed to terminate a contract through coercion. *Id.* Similarly, Dealers offer no evidence to support their argument that Chrysler needed or wanted to resort to coercive measures to receive the plaintiffs' approval. The plaintiffs' complete lack of proof of coercion fails to satisfy its burden at this stage. Dealers have failed to establish coercion, a necessary element of counts one and two. Accordingly, Chrysler's motion for summary judgment for absence of coercion will be granted.

## B. ABSENCE OF ORDERS

■ Chrysler seeks summary judgment on all claims involving malallocation on the ground that the Dealers cannot produce the necessary evidence of vehicle orders. Dealers counter that they can produce evidence to show that they ordered specific automobiles, that these automobiles were available, that they did not receive the vehicles, and that Chrysler favored other area dealers in its allocation of automobiles. Dealers' proof of the first two facts listed, however, is insufficient.

Chrysler's allocation system required dealerships to order specific vehicles, outfitted with specific equipment, from the total vehicles allocated by Chrysler. All buildable ordered vehicles within the initial allotment were delivered to the dealership. Dealers have not produced and do not indicate that they can produce evidence of specific vehicle orders. Thus, Chrysler argues, Dealers fail to show that they ordered the number of vehicles they claim to have ordered, or that

the ordered vehicles were buildable. In either of these scenarios, Chrysler could not be held liable for failure to deliver the vehicles. As Dealers acknowledge, their burden is to produce evidence from which a jury could rationally infer that Chrysler engaged in a practice of unfair distribution of vehicles. Although direct evidence of specific orders is the strongest evidence, Dealers may support their case with a statistical analysis which demonstrates such unfair distribution. The statistical evidence offered at this stage does not seem to meet this minimal standard, however, and for this reason summary judgment will be granted on all claims involving malallocation of vehicles.

Chrysler urges this Court to adopt the test set forth in *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819, 835 (M.D.Tenn.1974). In *Cecil Corley,* the plaintiff dealer claimed that Pontiac failed to deliver vehicles " 'in quantities to meet Dealer's reasonable requirements....' " *Id.* As in the present case, the dealer did not challenge the manufacturer's allocation system, which, like Chrysler's, required dealers to submit orders for the manufacturer to fill. *Id.* The court held that the plaintiff dealer had to prove three elements in order to state a claim: (1) that it ordered more vehicles than it received; (2) that the vehicle models ordered were available for delivery, or if there was a shortage that the dealer did not allocate the available vehicles reasonably; and (3) that the manufacturer failed to make such vehicles available to satisfy the dealer's reasonable requirements. *Id.; see also Deas v. PACCAR,* 775 F.2d 1498, 1507–06 (11th Cir. 1985), *cert. denied;* 475 U.S. 1129, 106 S.Ct. 1658, 90 L.Ed.2d 201 (1986) (applying the *Cecil Corley* test).

The *Cecil Corley* plaintiff "failed to introduce evidence of even one single occasion that an automobile of a specific model number, color and accessories was ordered," let alone evidence of such vehicles' availability or Pontiac's refusal to deliver any such vehicle. *Cecil Corley,* 380 F.Supp. at 836. Rather, the plaintiff relied entirely on evidence that a competing dealership received approximately twice the number of Pontiacs that plaintiff received. *Id.* at 835. The court emphasized

**750**

that without evidence of the orders placed by the competing dealership or the plaintiffs, such a comparison was meaningless. *Id.* at 839. On this evidence the court concluded that "the jury could not rationally have inferred that Pontiac had not complied with its obligations in furnishing vehicles to meet plaintiff's 'reasonable requirements....' " *Id.* at 836–37. Because the evidence entered could not support a finding of liability, the court granted the defendant's motion for judgment notwithstanding the verdict. *Id.* at 839.

In *Deas,* the Eleventh Circuit affirmed the district court's grant of judgment notwithstanding the verdict, because the plaintiff failed to prove violations of the ADDCA or the comparable Florida act. 775 F.2d at 1508. The court pointed out several areas in which the plaintiff's proof was insufficient. Applying the "well-reasoned" test of *Cecil Corley,* the court found no evidence showing that the ordered vehicles were available for delivery. *Id.* at 1507–08. In the absence of such evidence, it would be "impossible for the jury to accurately determine whether Peterbilt had acted in bad faith" by failing to deliver the vehicles. *Id.* at 1508. The court also rejected the plaintiffs' attempt to prove malallocation by comparison to other dealerships. The plaintiffs' expert failed to present sufficient facts demonstrating that the dealers used for comparison were similar to the plaintiffs with regard to geographic location, size, product mix, and market potential. *Id.* at 1507. Some of the dealerships used for comparison were from a different geographical region than the plaintiffs, and most were among the more profitable dealerships in the area. *Id.* at 1506. Although comparison evidence may be helpful, the court held, it must be supported by a factual basis establishing the relevance of the comparison. *Id.* at 1507.

In *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.,* the plaintiff dealer won a jury verdict on its ADDCA claim, relying primarily on evidence that New England Toyota (NET) delivered only slightly more than half of the vehicles due under the allocation system. 708 F.2d 814, 821 (1st Cir.), *cert. denied,* 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983). Although the "thrust of [the] appeal [was] directed at the calculation of damages, not the finding of liability," the court did address the liability issue briefly. *Id.* at 818. Edwards proved liability to the jury with evidence of troubled relations between it and NET, possible harassment by NET, and a "sudden and entirely unexplained disparity" between the allocations to Edwards and allocations to a competing dealership. *Id.* at 818–19. Immediately after Edwards presented NET with a list of demands, NET apparently disregarded its allocation formula and "shorted" Edwards by allocating approximately 50% fewer vehicles to it than to a nearby competitor. *Id.* at 818 & n. 2. The court found this sufficient evidence to support the plaintiff's jury verdict. The plaintiff's evidence on damages consisted of testimony by Edwards' president that he could have sold more vehicles and of customers' purchase agreements canceled because of vehicle unavailability. *Id.* at 825. In this context, the First Circuit rejected the defendant's argument that failure to present evidence of unfilled orders precluded any finding of compensable damages. *Id.* at 820–21. The court stated that once liability was established, evidence of unfilled orders was not essential "provided there is some other evidence from which a jury might rationally conclude the dealer would have sold the extra cars if it had them." *Id.* at 821. The president's statements that he could have sold the extra cars, along with the canceled orders placed by customers sufficed for this purpose. *Id.*

■ The defendant argues first that orders posted by computer cannot suffice for "written" orders. (Def.'s Mot. for Summary Judgment as to Absence of Orders at 5–9.) As an initial matter, neither *Cecil Corley* nor *Deas* specify any required form for evidence of orders, and the ADDCA is silent on the issue. For the reasons stated below, I see no reason to import such a requirement. The Maryland statute, however, states that a manufacturer must deliver vehicles in reasonable quantities "after receipt of a written order." Md.Code Ann., Transp. § 15–208. The plaintiffs argue that "a variety of media forms is expressly recognized in the law as a writing." (Pl.'s Opp'n to Absence of Orders at 12.) As support, the plaintiffs cite Federal Rule of Evidence 1001, which states that writings include "letters, words, or numbers,

..., set down by ... typewriting, printing, ... magnetic impulse, ... or other form of data compilation." The plaintiffs also cite *Clyburn v. Allstate Ins. Co.,* in which the court found data contained on a computer disk satisfactory notice of a cancellation requirement. 826 F.Supp. 955 (D.S.C.1993). In *Clyburn,* a South Carolina statute provided that cancellation of an insurance policy was not effective "unless written notice of cancellation" was delivered. *Id.* at 956. The court reasoned that the medium of transmitting information is not crucial in today's " 'paperless' society," and that information stored on disk was not different in kind from printed information. *Id.* at 956–57. In fact, the court noted that information on disk can be retrieved and printed on hardcopy at will. *Id.* at 957. Analogizing to the acceptance of videotapes and audio recordings as writings in other contexts, the court held that information stored on computer disk constituted "written notice" for the purposes of the statute. *Id.*

The *Clyburn* reasoning applies to the present case. For the purposes of this opinion, no significant differences exist between a written order and an order placed through the DIAL system. The dealerships manually typed the orders into a computer, and the computer transmissions were received by Chrysler in lieu of paper orders. The orders could be printed onto hardcopy on demand by either the dealership or Chrysler. Moreover, the orders were routinely saved for an unspecified period of time after receipt by Chrysler. Chrysler has not received, and there is no indication that it is equipped to receive, paper orders for at least a decade.

If written orders are required, then Chrysler, by establishing and imposing the DIAL system, would be able to avoid liability altogether for wrongful acts. Such unilateral preclusion of further claims is inappropriate. The Fourth Circuit recognized as much in 1984 in holding that audio tapes were within the scope of "records" for the purpose of a search warrant: "Standards of pragmatism and common sense must necessarily be adaptable to changing times and technological advances. While decades ago it might have been difficult to reasonably infer that records existed in some form other than written, in the mid–1980's common sense demands that we refrain from remaining so inflexible." *United States v. Truglio,* 731 F.2d 1123, 1128 (4th Cir.), *cert. denied,* 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984).

Chrysler also argues that the absence of evidence regarding specific orders prevents Dealers from demonstrating that they were due certain vehicles and that Chrysler treated them unfairly by refusing these vehicles. The plaintiffs counter that Dealers' representatives will testify that orders were placed (*see* Cash Aff., Pl.'s Opp'n to Absence of Orders, Exhibit B ¶¶ 12–13); that Chrysler's production of computerized records of orders proves that orders were received by Chrysler (Pl.'s Opp'n to Absence of Orders at 13 (citing Joint Aff., Exhibit C ¶ 5)); and that the plaintiffs' experts concluded that Chrysler did not provide reasonable quantities of motor vehicles to the plaintiffs (Joint Aff ., Pl.'s Opp'n to Absence of Orders, Exhibit C ¶ 9).

Imposing an absolute requirement of evidence detailing specific orders placed by a dealership, as Chrysler urges, seems inconsistent with the purpose of the statutory and common law remedies for malallocation. Rather, as discussed in *Jay Edwards,* an expert's comparative statistical analysis of competing dealerships should be sufficient under certain circumstances to make out a prima facie case of malallocation. This result is not inconsistent with *Cecil Corley* and *Deas,* in each of which the plaintiffs failed to offer any reliable proof to satisfy their burden.

A dealer's expert's statistical analysis, however, must be sufficiently conclusive to demonstrate that the manufacturer malallocated vehicles to the plaintiff. Dealers' experts' report in the present case does not satisfy this standard. The statistical evidence alone does not demonstrate the "sudden and unexplained disparity" which provided the basis for the plaintiff's judgment in *Jay Edwards,* 708 F.2d at 818. Perhaps most important, the term "sudden" in *Jay Edwards* indicates that the two dealerships, the plaintiff's and the comparison dealership, were once comparable and that conditions changed at some discrete point. There was no evidence to indicate that Jay Edwards'

ordering patterns had changed or that it was somehow due fewer vehicles under the existing allocation system. Thus, the fact finder had a point of reference, the similar dealership, from which to draw conclusions. When Jay Edwards suddenly suffered an unexplained drop in its receipts in the context of an already hostile relationship, a fact finder could rationally infer that Jay Edwards was due at least some of the extra vehicles, that it had ordered some of the vehicles it never received, that some of those vehicles were buildable, and that the manufacturer was treating it unfairly by continuing to deliver vehicles to the similar dealership.

By comparison, no evidence has been presented to prove that Dealers were ever on a par with the dealerships offered for comparison in terms of Caravan or Intrepid receipts. In sum, the experts' report indicates only that Dealers received a lower percentage [8] of Caravans and Intrepids than did two other dealerships, a result which could logically be attributable to Chrysler's reasonable allocation algorithm or to fewer buildable orders by Dealers.[9] The fact finder in the present case has no rational way of discerning whether Dealers' lower percentage of Caravans received during the period in question was a function of the allocation system's reliance on past sales performance, on plaintiffs' ordering practices, or on Chrysler's malallocation of vehicles. In this respect, Dealers present a case more closely similar to *Cecil Corley* and *Deas*. Because there is no rational basis for a fact finder to distinguish between these possibilities, only the third of which creates liability for Chrysler, Dealers fail to carry their burden of production at this stage.

Dealers' experts' comparison with Koons is similarly unavailing. Koons was a unique case in which a new dealership was allocated its optimal mix of vehicles. That plaintiffs' allocation did not equal that of Koons does not establish that plaintiffs were treated unfairly. Because Dealers do not challenge Chrysler's allocation algorithm, there is no logical means of determining whether Chrysler acted wrongfully or within its rights. Thus, the evidence of different receipts of Koons and Dealers is not sufficient to support their claim.

Finally, Dealers have not indicated that any witness can testify to the specifics of any orders placed. They may be able to establish that dealerships generally were contacted when they ordered unbuildable vehicles, and that they were never so contacted. Nonetheless, this testimony does not overcome the lack of necessary proof on the existence of orders because Dealers cannot prove that they were due the same number or percentage of Caravans or Intrepids as other dealers under Chrysler's unchallenged allocation system.

Dealers have not produced sufficient evidence to satisfy the *Cecil Corley* test or to otherwise challenge Chrysler's allocation of vehicles to them. Accordingly, Chrysler's motion for summary judgment as to the absence of orders is granted as to all remaining counts in the complaint.

---

8. The lack of figures in the experts' report, while not crucial in this case, leaves the fact finder without a reference point by which to judge the data. Because they offer no concrete figures, the basis for comparison is diminished.

9. Plaintiffs' experts also fail to offer proof of similarities between Dealers and the two dealerships chosen for comparison, other than their location in the same distribution Zone. *See Deas*, 775 F.2d at 1506–07 & n. 22 (finding that dealerships chosen for comparison were not sufficiently similar where they were not all located in the same region as plaintiffs and they were not representative examples of dealerships within the region); *see also Jay Edwards*, 708 F.2d at 821 n. 6 (rejecting challenge based on lack of similarity because the defendant's counsel "did not specifically contend that the dealerships were geographically so distant as to make them incomparable, a possibility not necessarily apparent").